BLACK HILLS CORPORATION, D.B.A. BLACK HILLS POWER AND LIGHT COMPANY, AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8248–91.           Filed August 3, 1993.

*George R. Abramowitz, Steuart H. Thomsen, Dennis L. Allen,* and *Diana E. Buckley,* for petitioners.

*Judy Jacobs Miller* and *Diane D. Helfgott,* for respondent.

HALPERN, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $40,492.04 and $42,312.02, for 1983 and 1984, respectively.

The issues for consideration are: (1) Whether purported insurance premiums paid by a petitioner subsidiary in 1983 and 1984 were payments for "insurance"; and (2) if so, whether such payments were ordinary expenses deductible in those years.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioner Black Hills Corp., d.b.a. Black Hills Power & Light Co. (Black Hills), is a South Dakota corporation. At the time the petition herein was filed, Black Hills had its principal place of business in Rapid City, South Dakota.

Black Hills is the common parent of an affiliated group of corporations making a consolidated return of income. Petitioner Wyodak Resources Development Corp. (Wyodak) is a wholly owned subsidiary of Black Hills. Wyodak operated a surface coal mine in Wyoming during the years at issue.

Petitioners claimed deductions on their 1983 and 1984 consolidated tax returns for Wyodak's purported insurance expenses in those years. The term "petitioner", when used in the singular, hereinafter will refer to Wyodak.

## I. *Black Lung Liability and Claims*

### A. *Liability*

Operators of coal mines, including petitioner, are liable under the Federal Coal Mine Health and Safety Act of 1969 (the Act), Pub. L. 91-173, 83 Stat. 742, 30 U.S.C. secs. 901-945 (1988), as amended, for certain compensation, medical, and other benefit payments to employees for black lung and other occupational diseases of the lungs.[1] Only an individual who is a "miner", or a survivor of a miner, is entitled to benefits under the Act.[2] During the years at issue, the Act imposed an insurance requirement, requiring petitioner either to maintain commercial insurance from an insurance company authorized under the laws of any State to insure workers' compensation, or to qualify as self-insured with respect to the liability imposed by the Act. 30 U.S.C. sec. 933. Liability under the Act is considered a form of workers' compensation liability.

Mine operators, including petitioner, also are liable for black lung disease claims under applicable State workers' compensation or occupational disease laws (collectively workers' compensation laws).

### B. *Timing of Claims*

Generally, black lung disease (black lung) is not totally disabling. Consequently, many miners continue working as miners after contracting black lung. In fact, most miners with black lung make no black lung claims prior to their separation from the workforce. Separation from the workforce occurs, for example, upon retirement, death, or mine closing. Many of the miners at a particular mine at the time the

---

[1] "Black lung disease" is the common expression for pneumoconiosis.

[2] A miner is defined by sec. 902(d) of the Federal Coal Mine Health and Safety Act of 1969 (the Act), Pub. L. 91-173, 83 Stat. 742, 30 U.S.C. secs. 901-945 (1988), as an individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal, or who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.

mine closes will then separate from the workforce. Accordingly, a typical mine operator can expect few claims while its mine operates and many claims shortly after the mine closes. Anticipated losses for the typical mine operator due to successful black lung claims therefore are much higher for the year in which the mine closes (mine-closing year) than for any earlier year (pre-mine-closing year).

## II. *The Purported Insurance Arrangement at Issue*

### A. *Formation of SOIL; Petitioner's Policy*

Security Offshore Insurance, Ltd. (SOIL), was formed in 1982. SOIL was formed by a group of surface coal mine operators, including petitioner, to insure their liability under the Act and State workers' compensation laws. Petitioner owned roughly 9.5 percent of SOIL's common stock and none of its preferred. Because SOIL, a Bermuda corporation, was not licensed to do business in the United States, a mine operator's purchase of a policy from SOIL did not satisfy the Act's insurance requirement, and such mine operator still was required to qualify as self-insured. 30 U.S.C. sec. 933. In 1983, SOIL issued seven policies with respect to mines largely owned, directly or indirectly, by its shareholders, including a policy issued to petitioner (the policy). In 1984, SOIL renewed those seven policies and issued two others with respect to mines owned, directly or indirectly, by its shareholders. Seven of those nine policies, including petitioner's, remained in force as of January 1993.

The policy indemnified petitioner, within certain limits, against, among other things,

all compensation, medical and other benefit payments for black lung or other occupational diseases of the lung which the Insured is legally obligated to pay in connection with the mine operation at the location specified in the Declarations and pursuant to the workers' compensation law or the Federal Coal Mine Health and Safety Act of 1969 * * *

The term of the policy was 1 year (a policy year). Petitioner was insured (covered) against black lung claims so long as (1) such claim was made within the policy year or within 2 years of policy termination, and (2) the claimant's last exposure to black lung conditions occurred during the present or a prior policy year. The policy was guaranteed renewable; i.e., petitioner had the option to renew the policy for successive

yearly terms. Among other events, a failure by petitioner to renew the policy for a successive yearly term constituted a termination of the policy. The policy was transferable, but only with SOIL's consent.

Absent an endorsement (and additional premium), the policy did not cover claims made by employees hired for, or transferred to, the mine during the 60 months preceding termination of the policy (5-year requirement). On its initial application submitted to SOIL, petitioner listed 66 active employees; on its renewal application (used to compute 1984 premiums), petitioner listed 68 employees. Had petitioner terminated its policy at the end of 1983 or 1984, only 31 or 39 of its employees, respectively, would have been covered by the policy, due to the 5-year requirement, unless Wyodak requested an endorsement and paid an additional amount to cover the other employees.

Policy benefits were limited to those to which miners (or survivors) would be entitled under the Act, plus assumed escalations, set forth in a document entitled "The Manual of Rules" (the manual).[3] Benefits further were limited, in the aggregate, to the product of (1) an assumed average medical benefit amount (including assumed escalations thereof), set forth in the manual, and (2) the number of successful claims.[4]

### B. *Premiums*[5]

### 1. *Overview*

The method for determining premiums is set forth in the manual. The manual provides that, by employing various assumptions, a mine's total projected liabilities for black lung

---

[3] It is not entirely clear how this provision can be reconciled with the policy's covering claims under Wyoming's workers' compensation laws in addition to those brought under the Act. We believe that the limit was intended to apply where both Wyoming's workers' compensation laws and the Act apply, but the former is more generous to the miner than the latter. We also believe that, where only the workers' compensation laws apply, recovery under the policy, if limited at all, was limited to the amount that would be recoverable by the miner under the Act, *if the Act applied.*

[4] The policy further provides that SOIL generally would only be liable to the extent claims are not recoverable under some other insurance policy possessed by petitioner. Petitioner possessed statutory workers' compensation insurance, covering claims for State workers' compensation benefits, during at least some portion of the years at issue.

[5] The premium discussed herein is a "pure premium", meaning that it is designed to offset expected losses exactly. Expenses and a 4-percent charge for risk contingencies and profit were added to the pure premium to arrive at the total premium charged. For the sake of simplicity, we generally will not distinguish between the pure premium and the total premium herein.

claims can be determined. The amount so determined is then redetermined on a present-value basis. The redetermined present-value figure represents the total amount that would have to be invested, at an assumed interest rate, to satisfy total projected liabilities. Assumptions as to benefit level and mortality also are taken into account. The primary consideration in setting premiums is that the present value of premiums received over the anticipated life of the mine be sufficient to offset the present value of projected liabilities. It is not considered important, however, that each annual premium accurately reflect benefits anticipated to be paid by SOIL on account of coverage for that policy year.[6] In fact, the design is just the opposite. Although losses are expected to be low for each pre-mine-closing year, and high for the mine-closing year, premiums are designed to be relatively constant. Premiums collected with respect to pre-mine-closing years are designed to exceed losses for such years, thereby building up a reserve against the high losses anticipated for the mine-closing year. The reserve, combined with an otherwise insufficient premium for coverage in the mine-closing year, is designed to offset projected losses for that year. Because of that front-loaded-premium arrangement, if the policy is terminated earlier than the assumed mine-closing date (due to early mine closing or otherwise), the insured can be required to pay an additional premium equal to the difference (plus interest) between the premiums actually paid and the premiums that would have been paid had the termination date initially been assumed to be the mine-closing date (early termination charge).

## 2. Computation of Premiums

### a. Initial Premium

The manual provides for annual premiums to be calculated under what it terms the "entry age normal" method. The annual premium is arrived at in steps. In the first year, the following steps are followed: First, the present value of pro-

---

[6] Under the policy, coverage for a particular policy year extended not only to claims made during that year but, if the policy were terminated during that year, to claims made within 2 years thereafter (provided that the miner's last exposure occurred prior to such policy termination). Hereafter, the burden of paying claims pursuant to such coverage for a policy year will loosely be referred to as losses *for* (or in) the year of coverage, although, as a practical matter, most or all benefits paid by SOIL on account of coverage for such year will be paid in later years.

jected benefits for current employees is calculated. Second, the present value of projected benefits for inactive employees (who have terminated employment with the insured, died, or retired since the initial effective date of the policy) is calculated. The sum of the first two calculations equals the present value of total projected benefits. Third, the present value of total projected benefits is broken into two components for amortization: Total normal cost and total past service liability, determined as follows. The present value of projected benefits for active employees is allocated to produce an annual charge that is a constant percentage of each employee's pay (or expected pay) in each year from the first day of the employee's mine employment to his last.[7] The portion of the present value of total projected benefits for active employees allocated to the current and all future years is the total normal cost. The total past service liability equals the sum of (1) the present value of the projected benefits for inactive employees, and (2) the portion of the present value of total projected benefits for active employees allocated to all prior years. Fourth, current charges for normal cost and past service liability are determined. The portion of the total normal cost allocated to the current year is the current normal cost. The total past service liability is amortized over the lesser of 10 years or one-half the (assumed) remaining mine lifetime, to produce an annual cost that is a constant percentage of payroll. The portion of such cost allocated to the current year is the current past service liability. Fifth, current normal cost and current past service liability are added together (along with additional amounts for risk, expenses, and profits) to produce the current annual premium. This premium can be increased by the above described early termination charge, if appropriate.

## b. *Renewal Premiums*

An accounting mechanism, called a reserve account, figures directly in the calculation of the annual renewal premium. The reserve account does not involve an actual segregation of funds, but rather is a bookkeeping record of various credits

---

[7] The premium is tentatively established on the basis of estimated payroll information supplied by the mine operator. If actual payroll exceeds estimated payroll, the final premium will exceed that tentatively determined earlier. The difference may be charged as an "audit premium".

and charges allocated to an insured. Credits to the account include premium payments, allocated portions of investment income and unrealized securities gains, and credits resulting from the termination of other insureds' policies where other insureds have unrefunded positive reserve account balances. Charges to the account include the estimated present value of approved claims against the insured,[8] deductions resulting from the termination of other insureds' policies where other insureds have negative reserve account balances, expenses incurred in connection with handling claims against the insured, and allocated portions of unrealized securities losses.

The computation of renewal premiums differs from the computation of the initial premium in three respects, each of which involves the reserve account.

### (1) *Reserve Deficiency Charge*

To the extent there is a negative balance in an insured's reserve account due to approved claims, the amount of such balance is included in the following year's renewal premium (reserve deficiency charge).

### (2) *Reserve Insufficiency Charge*

To the extent the reserve account otherwise is less than the amount projected,[9] the difference is not included in full in the following year's renewal premium, but rather is amortized over the following 5 years (reserve insufficiency charge).[10]

### (3) *Computation of Total and Current Normal Cost*

The total normal cost is derived by (1) recalculating the present value of total projected benefits (in the same manner as for the initial premium calculation), and (2) subtracting the sum of (i) the unamortized balance of the total past service liability (as initially determined), and (ii) the reserve

---

[8] The amount actually paid by SOIL may be greater or less than the claim's present value. No subsequent adjustments to the reserve account are made when that differential is determined.

[9] Such shortfall might for example be due to unexpected successful claims or unexpectedly poor investment experience.

[10] Thus, if an insured renews its policy with SOIL each year until mine closing, such insured bears the economic consequences of 100 percent of any losses arising prior to termination of the policy.

account balance. That total normal cost then is allocated to produce an annual charge that is a constant percentage of each employee's pay (or expected pay) in each year from the current year to the employee's last year of mine employment. The portion allocated to the current (renewal) year is the current normal cost for that year.[11]

## C. *Refunds*

The policy permitted petitioner to receive a refund of all or part of its reserve account balance 2 years subsequent to the policy's termination, subject to a deduction of the maximum potential liability for all pending, unresolved claims. (The reserve account balance, as reduced, will hereafter be referred to as the adjusted account balance.) The policy permitted a refund of a percentage of the adjusted account balance, the percentage generally depending upon the number of complete years the policy previously had remained in effect, as follows:

| Complete years policy in effect | Percent refunded |
| --- | --- |
| 0-4 | -0- |
| 5-15 | 4 × (number of completed policy years) + 30 |
| 16+ | 100 |

There were, however, exceptions to the above rule. If the policy had been terminated on or after the anticipated mine-closing date, the percentage refunded would have been 100. Further, if any of the following contingencies had occurred, the policy would have been treated as having been terminated on or after the anticipated mine-closing date, and petitioner therefore would have received a 100-percent refund: (i) Termination of the policy at a time when the insured no longer can be held liable for claims covered by the policy, (ii) termination of the policy at a time when the insured, as a result of changes in circumstances beyond its control, no longer can qualify as self-insured, or (iii) petitioner's (an insured's) declining, at any time within 24 months after termination of the policy, to have in force another SOIL policy governed by the manual. After resolution of all pending

---

[11] The current past service liability for such year is the amount (if any) that was allocated to such year when the initial premium was calculated.

claims, the portion of the reserve account balance set aside for such claims, but not ultimately paid out, would have been refunded to the same extent as the adjusted reserve account.

OPINION

Petitioners claim deductions under section 162 for purported insurance premium payments to SOIL during the years at issue. Respondent has disallowed substantial portions of those deductions on the grounds that: (1) Such payments were not insurance premiums, because the transaction between petitioner and SOIL was not an insurance arrangement; and (2) even if such payments were insurance premiums, they were (in large part) not ordinary and, thus, are not deductible in the years claimed. Petitioners bear the burden of proof on both of those issues. Rule 142(a).

I. *Insurance*

Certain business-related insurance expenses unquestionably are deductible under section 162. E.g., sec. 1.162-1(a), Income Tax Regs. There is, however, no definition of the term "insurance" in the Internal Revenue Code. In *Helvering v. Le Gierse,* 312 U.S. 531, 539-540 (1941), the Supreme Court addressed that statutory void, establishing: (1) An insurance transaction must involve "insurance risk"; (2) insurance involves risk shifting and risk distributing; and (3) "insurance", absent some statutory definition, is defined in its commonly accepted sense. *Amerco & Subsidiaries v. Commissioner,* 96 T.C. 18, 38 (1991), affd. 979 F.2d 162 (9th Cir. 1992). Insurance risk is involved when an insured faces some loss-producing hazard (not an investment risk), and an insurer accepts a payment, called a premium, as consideration for agreeing to perform some act if and when that hazard occurs. *Id.* Risk shifting involves one party's shifting its risk of loss to another, whereas risk sharing involves the party onto whom risk is shifted distributing a portion of that risk among others. *Id.* at 40.[12] In an insurance transaction, each insured shifts its risk of a loss greater than the insurance premium to the insurance company; the insurance com-

---

[12] Of course, only the risk of a loss greater than the insurance premium is shifted to the insurance company (and distributed to other insureds). See Huebner & Black, Life Insurance, 296 (10th ed. 1982).

pany (to the extent it can draw on the premiums of other insureds to pay the claim) distributes that risk among such other insureds. Cf. Huebner & Black, Life Insurance 296 (10th ed. 1982) ("Thus, the [insured's] loss, instead of falling on one, can be equally divided among all.").

Respondent concedes that insurance risk is present, the loss-producing hazard being successful claims, predominantly under the Act, for black lung disease. Respondent does not, however, agree that risk shifting or risk distribution is present in the transaction between petitioners and SOIL. We are not prepared to agree with respondent that no risk whatever is shifted or shared, because it appears that, under petitioner's policy with SOIL, at least upon the closing of petitioner's mine, petitioner might well receive relief from liabilities substantially greater in amount than the total premiums contributed (plus interest and other allocated investment gains). Thus, risk would be shifted to SOIL and, to the extent the balances in other reserve accounts might be positive at that time, distributed to other insureds.[13] We need not, and do not, decide that matter, however, because we are persuaded by respondent's second argument, addressed below.

## II. *Not Currently Deductible*

Accepting arguendo that insurance risks are shifted and distributed by the transaction between petitioner and SOIL, and that the payments at issue therefore are insurance premiums, petitioners still must prove facts sufficient for us to conclude that such premiums are deductible in the years at issue.[14] Rule 142(a). As explained below, petitioners have failed to make that proof and, accordingly, we hold for respondent.

### A. *Capital Expenditure*

In order to be immediately deductible under section 162(a), an expense, among other requirements, must be ordinary. Nonordinary expenses, called capital expenditures, "if deductible at all, must be amortized over the useful life of

---

[13] The resultant charge to the reserve accounts of other insureds would reduce their potentially available refunds.

[14] For convenience, it hereinafter will be assumed, arguendo, that actual insurance premiums are involved.

the asset." *Commissioner v. Lincoln Sav. & Loan Association,* 403 U.S. 345, 353 (1971) (quoting *Commissioner v. Tellier,* 384 U.S. 687, 689-690 (1966)); see also sec. 1.461-1(a)(1), Income Tax Regs.

Respondent argues that petitioner's premium payments were capital expenditures, contending, inter alia, that the reserve account created thereby constitutes a distinct asset. In making that contention, respondent relies on the Supreme Court's opinion in *Commissioner v. Lincoln Sav. & Loan Association, supra.* In *Lincoln Savings,* the taxpayer, Lincoln Savings & Loan Association (Lincoln), was insured by the Federal Savings & Loan Insurance Corporation (FSLIC). Under the insurance arrangement between Lincoln and FSLIC, Lincoln paid premiums to FSLIC, which maintained two reserves: A primary reserve, into which "regular premiums" were deposited, and a secondary reserve, into which "additional premiums" (prepayments of future premiums) were deposited. The primary reserve was FSLIC's general reserve, and Lincoln had no property interest therein. The secondary reserve, however, was quite different. Lincoln received credits for prepaid premiums deposited in the secondary reserve, and for its pro rata share of the secondary reserve's earnings. The secondary reserve was available to cover Lincoln's losses (or those of other insureds) only to the extent that other accounts of FSLIC might prove insufficient. Lincoln's pro rata share of the secondary reserve was transferable or refundable (in cash) under certain circumstances. Upon the primary reserve's reaching a specified level, Lincoln's obligation to pay additional premiums was to terminate and, moreover, Lincoln's pro rata share of the secondary reserve (to the extent exceeding the specified level) was to be used to pay its regular premiums.

The Supreme Court determined that Lincoln possessed a distinct property interest in its pro rata portion of the secondary reserve, based largely on the following factors: (1) The transferability, for approved situations of merger, consolidation, and the like, of Lincoln's pro rata interest in the secondary reserve; (2) the prospective refund of Lincoln's pro rata interest in the secondary reserve upon termination of its insured status, upon receivership or liquidation, or upon the primary reserve's reaching a specified level; (3) the availability of Lincoln's pro rata interest in the secondary

reserve to pay its regular premiums; (4) FSLIC's maintenance of a separate bookkeeping account for each insured's interest in the secondary reserve; and (5) Lincoln's receiving an annual credit for its pro rata share in the earnings of the secondary reserve. *Id.* at 355. In reaching that conclusion, the Court was well aware of the possibility that Lincoln's share of the secondary reserve would be consumed by FSLIC's losses and thus never would be refunded to Lincoln. The Court observed that such risk exists with any routine investment in a bank or insurance company, but is insufficient to convert a capital expenditure into a deductible expense. *Id.* at 357.

We think the reasoning of *Commissioner v. Lincoln Sav. & Loan Association, supra,* is applicable to the instant case. Like Lincoln, petitioner (1) was given credit for its pro rata share of a reserve; (2) was given credit for its pro rata share of that reserve's earnings; (3) was able to apply its interest in that reserve to reduce future premiums; and (4) was able to retrieve its investment by claiming a refund. The first two of these observations are reflected in our findings of fact, above, and require no further explanation. With respect to the third, as explained below, we have found that the premiums were front-loaded, meaning that the premiums charged for years prior to the final year of mine operation were made artificially high, so as to reduce—through prepayment—the premium that otherwise would be owing in the final year.

With respect to the fourth, we observed above that petitioner could have obtained a 100-percent refund 2 years subsequent to canceling the policy, so long as it declined to enter into another policy offered by SOIL (and governed by the manual).[15] That is not a material limitation on petitioner's right to a refund, and would appear to guarantee petitioner's having the benefit of all amounts added to (but not subtracted from) the reserve account. As a practical matter, the only arguably insurance-related limitation on petitioner's right to a refund for that portion of the premiums not used to pay its claims (and related expenses) was the possibility

---

[15] As noted, the reserve account, at that time, would have been reduced by the amount potentially necessary to pay all claims made but not either finally accepted or rejected. After the resolution of such claims, however, the amount set aside for such claims, to the extent not ultimately consumed thereby, would have been refunded to petitioner.

that other insureds would terminate their SOIL policies with negative reserve account balances, thereby reducing the balance in each remaining insured's reserve account.[16] That risk, shared by all of SOIL's insureds, is similar to that present in *Commissioner v. Lincoln Sav. & Loan Association,* 403 U.S. 345 (1971), and is akin to a routine investment risk in a bank or insurance company; such investment type risk is insufficient to convert a capital expenditure into a deductible expense. See *id.* at 357.

The only factor relied upon by the Court in *Commissioner v. Lincoln Sav. & Loan Association, supra,* that is not present here is the transferability of the reserve account. Although petitioner's interest ostensibly is transferable, the requirement that SOIL consent to such transfer renders that "right" somewhat dubious. As observed above, however, petitioner was entirely at liberty to cancel the policy and—by merely refraining from entering into another manual-governed policy with SOIL—receive a full refund of the reserve account balance. Such right to a refund achieves directly what transferability would achieve indirectly, giving petitioner the economic benefit of the reserve account balance. Accordingly, the lack of transferability is without significance.

In light of the foregoing, we consider the Supreme Court's opinion in *Commissioner v. Lincoln Sav. & Loan Association, supra,* to be controlling. The expenditures at issue served to create a distinct asset and therefore must be capitalized.[17] We next consider whether any portion of those expenditures gives rise to some deduction in the years at issue.

### B. *Consequences of Expenditures' Being Capital*

### 1. *Deduction for Current Benefit*

Respondent has allowed a portion of the insurance premium expenditures as a current deduction in each year at issue, apparently on the ground that petitioners received

---

[16] The potential refund, as stated, would have been reduced by petitioner's pro rata share of SOIL's investment losses, but that risk clearly is not insurance related and therefore would not give rise to a current deduction under sec. 162.

[17] In restricting our analysis to whether a distinct asset has been created, we do not wish to imply that, had no such asset been created, capital treatment necessarily would be inappropriate. The Supreme Court has established that an expenditure failing to create a distinct asset, but yielding substantial benefits beyond the taxable year, frequently will be a capital expenditure. *INDOPCO, Inc. v. Commissioner,* 503 U.S. ___, 112 S. Ct. 1039, 1044-1046 (1992).

*some* insurance benefits—and therefore are entitled to *some* deductions—in those years. See *Commissioner v. Lincoln Sav. & Loan Association, supra* at 358 ("If its [Lincoln's] share [of the secondary reserve] is used to pay losses or if * * * it is devoted to the payment of Lincoln's * * * [regular] premium, a deduction at that time for the amount so used would appear in order."). Although petitioners have not explicitly argued that, if we accept respondent's capital expenditure argument, respondent's allocation is incorrect, they have argued that the *entire* premiums paid produced current benefits. Accordingly, we think it appropriate to consider whether the expenditures at issue produced insurance benefits in those years in excess of those determined by respondent. If so, deductions in excess of those allowed by respondent clearly would appear appropriate. *Id.*

2. *Extent of Current Benefit in Years at Issue*

As explained, a mine operator, such as petitioner, can expect few claims while the mine operates, and many claims shortly after the mine closes. Thus, the risk of loss for the mine-closing year is much higher than the risk for any earlier year. The insurance contract between petitioner and SOIL provides coverage on the basis of claims made during a limited period: petitioner is insured against (1) claims made during a policy year and, if the policy is terminated during such year, against (2) claims made within 2 years of policy termination, provided that the miner's last exposure occurred prior to such termination. Thus, SOIL's risk of loss on account of its contract with petitioner is coordinate with petitioner's risk of loss over the life of the mine. To reflect accurately the disparity of risk to SOIL between the mine-closing year and any earlier year, the insurance contract logically ought to provide for very small premiums for the pre-mine-closing years and a very large premium in the mine-closing year. The actual premiums, however, do not reflect that principle and, consequently, are not commensurate with the actual risks of loss involved for each year. Instead, the premiums in pre-mine-closing years are much higher than warranted by the low risk involved and thus, in large part, constitute prepayments of the premium for the year in which the mine ultimately closes. That observation is confirmed in Mr. Doherty's expert report prepared on behalf of petitioner.

In early years \* \* \* premiums were expected to exceed incurred losses assuming the mine stays open. The difference could then be used to build up a reserve against the expected clustering of losses at mine closing.

Moreover, petitioner's guaranteed option to renew (without change in rating methodology) is consistent with the view that it prepaid premiums, and required a renewal option to assure it of getting credit for such prepayment in later years. Thus, it is clear that most (if not all) of the premiums paid during the years at issue are prepayments of a premium relating to the year of closing of petitioner's mine and are not currently deductible.[18]

We are unable to say that any significant portion of the premiums was designed to compensate SOIL for risk shifted on account of coverage for the years at issue. Petitioners have made the tactical choice to argue that the *entire* premiums paid were allocable to coverage for those years; that clearly is not the case. Thus, as a result of petitioners' failure of proof, they have left us without guidance as to the proper allocation. Lacking sufficient information to make our own estimate, cf. *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930), we conclude that respondent's is correct. Rule 142(a). Accordingly, we sustain respondent's determinations.

*Decision will be entered for respondent.*

---

[18] Petitioners insist that the premiums paid in each year at issue were actuarially determined and commensurate with the risk transferred to SOIL for each such year of coverage, respectively. All that petitioners offer in support of that contention, however, are ambiguous portions of expert reports and expert testimony that are taken out of context. Such reports and expert testimony, read *in context,* suggest nothing more than (1) the actuarial assumptions relied upon on in estimating the present value of petitioner's black lung liabilities were reasonable, and (2) the total premiums to be charged petitioner over the course of the policy, *collectively,* were commensurate with the risk transferred to SOIL over the course of the policy. They do not suggest that the specific premiums charged for each year at issue are commensurate with the risk of loss transferred to SOIL for each such year, respectively.