116 T.C. No. 18


UNITED STATES TAX COURT


METROCORP, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19780-98.            Filed April 13, 2001.


        M, a State bank, acquired a portion of the assets
and assumed a portion of the deposit liabilities of C,
a failed Federal savings association.  Before the
transaction, the deposit liabilities of M and C were
insured by different funds (B and S, respectively)
administered by the Federal Deposit Insurance
Corporation.  The transaction was a "conversion
transaction" under 12 U.S.C. sec. 1815(d)(2)(B) (1994),
because M and C each participated in a different fund,
and M assumed C's deposit liabilities.  R determined
that the exit and entrance fees related to the
transaction which M paid to S and B, respectively,
under 12 U.S.C. sec. 1815(d)(2)(E) (1994), were non-
deductible capital expenditures.  The fees were
capitalizable, R asserts, because they produced
significant future benefits to M in that M, following
the assumption, insured all of its deposit liabilities
through B.  M's use of B to insure all of its deposit
liabilities meant that M's future costs for compliance
and insurance premiums would be lower than if M had

continued to use S to insure the assumed deposit liabilities.

Held: M's payment of the fees produced no significant future benefit to M that would require capitalization of either fee.

## OPINION

<u>James R. Walker</u> and <u>Charles L. Mastin II</u> for petitioner.

<u>Jennifer L. Nuding</u>, for respondent.

LARO, <u>Judge</u>: The parties submitted this case to the Court without trial. See Rule 122. Respondent determined deficiencies of $15,288, $14,372, and $14,375 in petitioner's respective taxable years ended October 31, 1993, 1994, and 1995. Following concessions, we must decide whether petitioner may deduct the exit and entrance fees which its subsidiary, Metrobank, paid to the Federal Deposit Insurance Corporation (FDIC) with respect to a "conversion transaction" under 12 U.S.C. sec. 1815(d)(2)(B)(iv) (1994). We hold it may.[1] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years. Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The parties have filed with the Court a stipulation of facts and certain related exhibits. We incorporate herein by reference that stipulation of facts and those exhibits. We find the

---

[1] Our holding renders moot the parties' other dispute; namely, whether the fees, if capitalizable, are amortizable.

stipulated facts accordingly, and we set forth the relevant facts in this background section.  We also set forth in this section, as they relate to the operation of the FDIC and of the insurance funds at issue, the pertinent provisions of title 12 of the United States Code (1994) (title 12).

Petitioner is a Delaware corporation whose principal office was in East Moline, Illinois, when its petition was filed.  It is a bank holding company that files consolidated Federal income tax returns.[2]  It reports its income and expenses using an accrual method and on the basis of a fiscal year ending on October 31. It includes in its consolidated returns a wholly owned subsidiary, Metrobank, that is a bank chartered in Illinois.

The FDIC is a congressionally established corporation that serves primarily to protect financial institution depositors by insuring any deposit up to $100,000 that is held by a bank or savings association participating in the FDIC insurance program. The Banking Insurance Fund (BIF) and the Savings Association Insurance Fund (SAIF) are separate funds which the FDIC maintains and administers under this program.  The BIF insures the deposit liabilities of participating banks, e.g., Metrobank.  The SAIF

---

[2] For purposes of title 12, the term "bank" generally refers to a State-chartered bank, and the term "savings association" generally refers to a Federal- or State-chartered savings association (or savings and loan or thrift as it is sometimes called).  12 U.S.C. sec. 1813(a) and (b) (1994).  We use herein the same terminology.  We refer collectively to banks and savings associations as financial institutions.

insures the deposit liabilities of participating savings associations; e.g., Community Federal Savings Bank (Community). Each financial institution that participates in the FDIC's insurance program is generally assessed a semiannual charge (premium) equal to its liability for deposits multiplied by the applicable rate set forth in 12 U.S.C. sec. 1817(b)(1)(C) or (D) (1994). Any amount assessed against a participant in the BIF is deposited into the BIF and is available to the FDIC for use with respect to any BIF participant. Any amount assessed against a participant in the SAIF is deposited into the SAIF and is available to the FDIC for use with respect to any SAIF participant.

Community is a failed savings association. On October 16, 1990, Metrobank submitted to the FDIC a bid to consummate a transaction (transaction) under which Metrobank would acquire a portion of Community's assets and assume a portion of Community's deposit liabilities. Because Community and Metrobank each insured its deposit liabilities through a different FDIC fund, and Metrobank had agreed to assume Community's deposit liabilities, which would be insured after the transaction by the BIF instead of the SAIF, the transaction was a conversion transaction under 12 U.S.C. sec. 1815(d)(2)(B)(iv) (1994). Section 1815(d)(2)(B) of title 12 defines a "conversion transaction" as:

(i) the change of status of an insured depository institution from a Bank Insurance Fund member to a Savings Association Insurance Fund member or from a Savings Association Insurance Fund member to a Bank Insurance Fund member;

(ii) the merger or consolidation of a Bank Insurance Fund member with a Savings Association Insurance Fund member;

(iii) the assumption of any liability by--

(I) any Bank Insurance Fund member to pay any deposits of a Savings Association Insurance Fund member; or

(II) any Savings Association Insurance Fund member to pay any deposits of a Bank Insurance Fund member;

(iv) the transfer of assets of--

(I) any Bank Insurance Fund member to any Savings Association Insurance Fund member in consideration of the assumption of liabilities for any portion of the deposits of such Bank Insurance Fund member; or

(II) any Savings Association Insurance Fund member to any Bank Insurance Fund member in consideration of the assumption of liabilities for any portion of the deposits of such Savings Association Insurance Fund member;

Financial institutions are required by 12 U.S.C. sec. 1815(d)(2)(E) (1994) to pay to the FDIC exit and entrance fees on conversion transactions, and Metrobank agreed in its bid to pay these fees to the FDIC. That section provides:

Each insured depository institution participating in a conversion transaction shall pay--

(i) in the case of a conversion transaction in which the resulting or

acquiring depository institution is not a Savings Association Insurance Fund member, an exit fee * * * which--

    (I) shall be deposited in the Savings Association Insurance Fund; or

    (II) shall be paid to the Financing Corporation, if the Secretary of the Treasury determines that the Financing Corporation has exhausted all other sources of funding for interest payments on the obligations of the Financing Corporation and orders that such fees be paid to the Financing Corporation;

(ii) in the case of a conversion transaction in which the resulting or acquiring depository institution is not a Bank Insurance Fund member, an exit fee in an amount to be determined by the [Federal Deposit Insurance] Corporation * * * which shall be deposited in the Bank Insurance Fund; and

(iii) an entrance fee in an amount to be determined by the [Federal Deposit Insurance] Corporation * * *, except that--

    (I) in the case of a conversion transaction in which the resulting or acquiring depository institution is a Bank Insurance Fund member, the fee shall be the approximate amount which the [Federal Deposit Insurance] Corporation calculates as necessary to prevent dilution of the Bank Insurance Fund, and shall be paid to the Bank Insurance Fund; and

    (II) in the case of a conversion transaction in which the resulting or acquiring depository institution is a Savings

> Association Insurance Fund member,
> the fee shall be the approximate
> amount which the [Federal Deposit
> Insurance] Corporation calculates
> as necessary to prevent dilution of
> the Savings Association Insurance
> Fund, and shall be paid to the
> Savings Association Insurance Fund.

Metrobank consummated the transaction on November 2, 1990, and the FDIC approved the transaction on November 6, 1990, effective as of November 2, 1990. After the transaction, all of Metrobank's deposit liabilities (including those assumed from Community) were insured by the BIF. Metrobank could not have insured through the BIF the deposit liabilities it had assumed from Community without paying the exit and entrance fees.

In total, Metrobank paid to the FDIC an exit fee of $309,565 and an entrance fee of $43,339 on its assumption of Community's deposit liabilities. Metrobank paid those fees in five annual installments, paying $71,518 in each subject year ($62,735 for the exit fee and $8,783 for the entrance fee).[3] For each of the subject years, petitioner claimed a deduction for the payment of the fees during that year. Petitioner also claimed for those respective years deductions of $465,046, $463,583, and $311,245 that Metrobank paid to the FDIC as semiannual insurance premiums under 12 U.S.C. sec. 1817 (1994).

---

[3] We recognize that the sum of the exit and entrance fee ($309,565 + $43,339 = $352,904) is $4,186 less than the total of the five payments ($71,518 x 5 = $357,590). The record does not adequately explain the difference.

Pursuant to 12 U.S.C. sec. 1815(d)(2)(E)(i) and (iii) (1994), the FDIC deposited the exit fee into the SAIF, and it deposited the entrance fee into the BIF. Metrobank calculated the exit fee from a formula under which the fee equaled 0.9 percent (.009) multiplied by the total liability that it assumed from Community as to the deposits. See 12 C.F.R. secs. 312.1(j), 312.5(c) (2000). Metrobank calculated the entrance fee from a different formula under which the fee equaled the "Bank Insurance Fund reserve ratio" (BIF reserve ratio) multiplied by the "entrance fee deposit base" received from Community. 12 C.F.R. secs. 312.1(g), 312.4(b) (2000). The BIF reserve ratio was the ratio of the net worth of the BIF to the value of the aggregate total domestic deposits held in all participants of the BIF. See 12 C.F.R. sec. 312.1(c) (2000). The entrance fee deposit base was "those deposits which the Federal Deposit Insurance Corporation * * * [estimated] to have a high probability of remaining with * * * [Metrobank] for a reasonable period of time following the * * * [conversion transaction], in excess of those deposits that would have remained in the * * * [SAIF had Community] been resolved by means of an insured deposit transfer." 12 C.F.R. sec. 312.1(g) (2000). Community generally would have been resolved by an insured deposit transfer if its deposit liabilities had been paid by the FDIC or Resolution Trust Corporation. See id.

If Metrobank did not pay its annual FDIC insurance premiums after the transaction, the FDIC could commence administrative proceedings to terminate involuntarily Metrobank's FDIC insurance. Metrobank could also in certain circumstances voluntarily terminate its FDIC insurance. Metrobank would not have been entitled to a refund for the exit or entrance fee which it paid to the FDIC incident to the transaction if it terminated its FDIC insurance after the transaction either voluntarily or involuntarily.

At the end of 1990, the approximate rates for depository insurance under the BIF and the SAIF were .12 percent (.0012) and .208 percent (.00208), respectively. As of the same time, SAIF rates were set to exceed BIF rates until 1998.

Respondent determined that petitioner could not deduct either fee that Metrobank paid to the FDIC incident to the conversion transaction and disallowed petitioner's deductions for those payments. According to the notice of deficiency:

> It has been determined that your deductions for the entrance and exit fee paid to the Federal Deposit Insurance Corporation for the transfer of your insured deposits from one depository insurance to another depository insurance fund is a non-deductible capital expenditure that is not subject to depreciation or amortization.[4]

---

[4] The notice of deficiency indicates that the deposits were actually transferred from the SAIF to the BIF. This is not true. As explained herein, the BIF and the SAIF do not hold a financial institution's deposits but merely insure the deposits held by the
(continued...)

## Discussion

We are faced once again with the question of whether an expenditure may be deducted currently as an expense or must be capitalized and deducted in a later year. Following INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992), in which the Supreme Court clarified that nonasset-producing expenditures[5] may require capitalization if they provide significant future benefits to the payor, the parties dispute whether petitioner's entrance and exit fees are capitalizable expenditures. Respondent determined and asserts they are. Respondent's sole argument in support of his assertion is that Metrobank's payment of the fees generated significant future benefits for it. Respondent lists the following as future benefits which are significant to Metrobank: (1) Metrobank was able to insure its entire liability for deposits through one fund, subjecting itself to only one regulatory scheme and minimizing its risk of complicated compliance problems; (2) insurance premiums under the BIF were less than insurance premiums under the SAIF; and (3) the BIF was more stable than the SAIF. Petitioner asserts it may deduct the

---

[4](...continued)
financial institutions.

[5] We use the term nonasset-producing expenditures to refer to expenditures which do not create or enhance a separate and distinct asset.

fees.  Petitioner argues that Metrobank derived no significant long-term benefit from its payment of either fee.

We decide this case as framed by respondent and hold that petitioner may deduct the fees.  In reaching this holding, we specifically note that respondent did not determine, and has declined to argue, that the fees should be capitalized on the grounds that they were necessarily incurred in connection with the acquisition of another financial institution or, more specifically, the acquisition of the assets and liabilities of another financial institution.  See, e.g., INDOPCO, Inc. v. Commissioner, supra; Ellis Banking Corp. v. Commissioner, 688 F.2d 1376 (11th Cir. 1982), affg. in part and remanding in part on an issue not relevant herein T.C. Memo. 1981-123; American Stores Co. & Subs. v. Commissioner, 114 T.C. 458 (2000).  If respondent had made such a determination or argument, petitioner may well have wanted to offer evidence relating to it.  In order to avoid prejudicing petitioner with respect to a theory not raised before the case was submitted, we save any comment on that theory for another day.  See Leahy v. Commissioner, 87 T.C. 56, 64-65 (1986) (Court declined to consider a theory raised by respondent on brief where, as here, the parties submitted the case with the facts fully stipulated and presumably with an understanding of the legal issues to be presented and defended);

see also <u>Concord Consumer Hous. Corp. v. Commissioner</u>, 89 T.C. 105, 106-107 n.3 (1987).

Our analysis begins with a general background of the FDIC and the pertinent insurance funds.  Congress established the FDIC in 1933 to insure bank deposits, see <u>Lebron v. National R.R. Passenger Corp.</u>, 513 U.S. 374, 388 (1995); <u>FDIC v. Godshall</u>, 558 F.2d 220, 221 (4th Cir. 1977), and it established the Federal Savings and Loan Insurance Corporation (FSLIC) in 1934 to insure savings association deposits, see <u>United States v. Winstar Corp.</u>, 518 U.S. 839, 844 (1996).  Savings associations were required to participate in the FSLIC insurance system but could withdraw from the FSLIC insurance fund by converting from a Federal to a State charter.  See <u>Great W. Bank v. Office of Thrift Supervision</u>, 916 F.2d 1421, 1423 (9th Cir. 1990).

High interest rates, inflation, Government deregulation, fraud, and insider abuse caused a crisis in the savings association industry during the late 1970's and the 1980's.  The FSLIC's insurance fund was threatened by this crisis when a large number of failing savings associations approached the FSLIC with deposit insurance liabilities and hundreds of savings associations actually failed.  The FSLIC's insurance fund became insolvent by billions of dollars after the FSLIC paid out billions of dollars to cover the failed savings associations' insured deposits and incurred additional liabilities on its

closing of hundreds of problem savings associations.  See <u>United States v. Winstar Corp.</u>, <u>supra</u> at 845-846; <u>Great W. Bank v. Office of Thrift Supervision</u>, <u>supra</u> at 1423.

The Federal Home Loan Bank Board (Bank Board) was an independent agency in the Executive Branch of the United States with broad discretionary powers over the Federal home loan bank system.  In 1985, the Bank Board attempted to replenish the FSLIC insurance fund by raising the insurance premiums charged to the FSLIC-insured institutions through a "special assessment" at the maximum amount allowed by Congress.  As a result, many healthy FSLIC-insured savings associations, which paid insurance premiums of approximately $2.08 per $1,000 of insured deposits, took the steps necessary to meet the requirements to withdraw from the FSLIC insurance system and obtain insurance from the FDIC, which charged insurance premiums of only $.83 per $1,000 of insured deposits.  See <u>Great Western Bank v. Office of Thrift Supervision</u>, <u>supra</u> at 1423-1424.

Congress responded to the savings associations' attempt to change their insurer from the FSLIC to the FDIC by passing the Competitive Equality Banking Act of 1987 (CEBA), Pub. L. 100-86, 101 Stat. 552.  In relevant part, CEBA:  (1) Imposed a moratorium that prohibited savings associations from leaving the FSLIC insurance fund and (2) imposed a final insurance premium on savings associations which left the FSLIC insurance fund after

the moratorium expired.  See CEBA sec. 306(h), 101 Stat. 602, amended by Pub. L. 100-378, sec. 10, 102 Stat. 887, 889 (1988), current version at 12 U.S.C. sec. 1730(d)(1) (1994).  The intent of CEBA was to recapitalize the depleted FSLIC.  See Branch Banking & Trust Co. v. FDIC, 172 F.3d 317, 320 (4th Cir. 1999).

CEBA proved to be ineffective in replenishing the FSLIC's insurance funds, and, on August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub. L. 101-73, 103 Stat. 183, as an emergency measure to prevent the collapse of the savings association industry.  See H. Rept. 101-54(I) at 307 (1989); see also H. Conf. Rept. 101-222 at 393 (1989); United States v. Winstar Corp., supra at 856.  In relevant part, FIRREA abolished the FSLIC, transferred to the FDIC the responsibility of insuring the deposits at savings associations, and established the BIF and the SAIF.  FIRREA gave the FDIC responsibility for regulating both the insurance fund it had traditionally administered (now known as the BIF) and the insurance fund formerly regulated by the FSLIC (now known as the SAIF).  See FIRREA secs. 202, 215, 103 Stat. 188, 252.  FIRREA imposed on SAIF (as opposed to BIF) participants higher deposit premiums and a higher degree of supervision in an attempt to ensure the SAIF's strength.  See generally 12 U.S.C. sec. 1817 (1994).

Congress anticipated that SAIF participants would try to convert to BIF participants in order to escape the higher SAIF premiums and regulatory costs. Thus, Congress included in FIRREA certain control measures to prevent an exodus from the SAIF. See 12 U.S.C. sec. 1815(d)(2)(E) and (F) (1994). First, FIRREA required that entrance and exit fees be paid to the respective funds as to a conversion transaction between a BIF participant and a SAIF participant. See 12 U.S.C. sec. 1815(d)(2)(E) (1994). A higher exit fee was placed on financial institutions leaving the SAIF for the BIF in order to discourage SAIF-insured institutions from insuring their deposits with the BIF. See 12 U.S.C. sec. 1815(d)(2)(F) (1994). Second, FIRREA imposed a 5-year moratorium beginning on August 9, 1989, to replace the expired CEBA moratorium.[6] See 12 U.S.C. sec. 1815(d)(2)(A)(ii) (1994). Under the FIRREA moratorium, SAIF-insured institutions were generally unable to enter into conversion transactions, which essentially prevented them from converting to BIF-insured institutions and essentially ensured mandatory SAIF participation for savings associations during the moratorium's duration.

FIRREA imposed two relevant exceptions to the moratorium. First, the FDIC could allow certain conversion transactions involving the acquisition of a depository institution that was in

---

[6] Congress later extended the 5-year FIRREA moratorium, which was in effect during the relevant years.

default or in danger of default.[7] A financial institution that utilized this exception was required to pay an exit fee to the fund that insured the assumed deposit liabilities before the transaction and an entrance fee to the fund that insured the assumed deposit liabilities after the transaction. See 12 U.S.C. sec. 1815(d)(2)(C), (E) (1994). Congress provided explicitly that the entrance fee was imposed to prevent dilution of the reserves of the fund that began insuring the assumed deposit liabilities as a result of the transaction. See H. Rept. 101-54(I), at 325. The pertinent legislative history does not contain an explicit explanation of Congress' intent as to the imposition of the exit fee.

Under the second exception to the moratorium, certain conversion transactions could be consummated through a merger or consolidation (collectively, merger). See 12 U.S.C. sec. 1815(d)(3) (1994); see also FIRREA sec. 206(a)(7), 103 Stat. 196. Under this exception, which Metrobank could have utilized to effect the transaction, but decided not to, a bank holding company that controlled a SAIF-insured savings association could generally merge the savings association's assets and liabilities with a BIF-insured subsidiary. Because the deposit liabilities of the SAIF-insured institution and a certain percentage of

---

[7] The subject transaction was consummated under this exception.

future deposits always remained assessable by the SAIF, the financial institution utilizing this exception was not required to pay the exit and entrance fees as to the conversion transaction. See 12 U.S.C. sec. 1815(d)(3)(B), (G) (1994). The institution, however, could not during the moratorium period stop paying SAIF assessments on the ascertained percentage of the future deposits. The institution could switch the insurance coverage on those deposits, if it so desired, after the moratorium expired but only if the FDIC approved the switch and the institution paid the requisite exit and entrance fees.

With this backdrop in mind, we turn to the relevant text of the Internal Revenue Code. Section 162(a) generally provides that a taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".[8] Section 263(a)(1) generally provides that a deduction is not allowed for "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Whether an expense is deductible under section 162(a) or must be capitalized under section 263(a)(1) is a factual determination for which

_____

[8] An expense is ordinary if it is of common or frequent occurrence in the type of business involved. See Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. 111, 114 (1933). An expense is necessary if it is appropriate or helpful to the development of the taxpayer's business. See Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Welch v. Helvering, supra.

there is no controlling rule. Petitioner, as the taxpayer, bears the burden of establishing its right to deduct the disputed fees. See INDOPCO, Inc. v. Commissioner, 503 U.S. at 84, 86; Welch v. Helvering, 290 U.S. 111, 114-116 (1933); see also A.E. Staley Manufacturing Company and Subs. v. Commissioner, 119 F.3d 482, 486 (7th Cir. 1997), revg. and remanding 105 T.C. 166 (1995).

When an expense creates a separate and distinct asset, it usually must be capitalized. See, e.g., Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971); FMR Corp. & Subs. v. Commissioner, 110 T.C. 402, 417 (1998); Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. 872, 878 (1977), affd. 592 F.2d 433 (8th Cir. 1979). When an expense does not create such an asset, the most critical factors to consider in passing on the question of deductibility are the period of time over which the taxpayer will derive a benefit from the expense and the significance to the taxpayer of that benefit. See INDOPCO, Inc. v. Commissioner, supra at 87-88; United States v. Mississippi Chem. Corp., 405 U.S. 298, 310 (1972); FMR Corp. & Subs. v. Commissioner, supra at 426; Connecticut Mut. Life Ins. Co. v. Commissioner, 106 T.C. 445, 453 (1996). Expenses must generally be capitalized when they either: (1) Create or enhance a separate and distinct asset or (2) otherwise generate significant benefits for the taxpayer extending beyond the end of the taxable year.

Respondent makes no assertion that either fee created or enhanced a separate and distinct capital asset. Respondent's sole argument in support of the determination is that the fees generated for Metrobank the proffered benefits listed supra p. 10, which, respondent asserts, are significant long-term benefits to Metrobank. We disagree with respondent that any of these benefits are significant long-term benefits which would require either fee's capitalization. Although the fees may arguably have produced one or more future benefits for Metrobank, none of those benefits, when considered either separately or together, is enough to characterize either fee as a capitalizable expense. Under the requisite test, capitalization is not always required when an incidental future benefit is generated by an expense. See INDOPCO, Inc. v. Commissioner, supra at 87.

We are unable to find as a fact that Metrobank's payment of either fee produced for Metrobank a significant future benefit requiring capitalization. Whether a benefit is significant to the taxpayer who incurs the underlying expense rests on the duration and extent of the benefit, and a future benefit that flows incidentally from an expense may not be significant. See id. at 87-88. We find as a fact that Metrobank's payment of the fees produced for it no significant long-term benefit.

Metrobank did not pay either fee as a condition to obtaining FDIC insurance in the first place. Metrobank always had and,

absent a decision by it to the contrary, would always have had FDIC insurance for its deposit liabilities, including those deposit liabilities assumed from Community. Metrobank paid the fees to insure its assumed deposit liabilities with the BIF, the insurance fund in which it was already a participant, rather than with the SAIF, a fund with which it was unaffiliated. Any benefit that Metrobank derived from insuring the assumed deposit liabilities with the BIF, rather than the SAIF, is insignificant when weighed against the primary purpose for the payment of the fees. That purpose, as explained herein, was, in the case of the exit fee, to protect the integrity of the SAIF for the direct benefit of the FDIC and the potential benefit of the SAIF's participants, one of which was not Metrobank, by imposing upon Metrobank a final premium for the insurance coverage that the assumed deposit liabilities had received while insured by the SAIF before their assumption. The primary purpose of the entrance fee, as also explained herein, was to protect the integrity of the BIF by charging an additional first-year premium for insurance coverage on the assumed deposit liabilities.

It is critical that Metrobank would not have recovered any portion of either fee were it to have severed its relationship with the BIF. Metrobank paid the exit fee to the SAIF as a nonrefundable, final premium for insurance that it had already received. The SAIF had insured the assumed deposit liabilities

before the conversion transaction, and Metrobank was not affiliated with the SAIF either before or after the transaction. Metrobank had neither a right nor a chance to recover any of the exit fee following its payment of the fee to the SAIF; SAIF funds were available for use by the FDIC only with respect to SAIF participants.  As we view the exit fee in the context of the statutory scheme, we see that the fee serves mainly to compensate the former insurer (in this case, the SAIF) for its future loss of income as to the assumed deposit liabilities, which compensation flowed to the direct benefit of the FDIC and the potential benefit of the former insurance fund's participants. But for the conversion transaction, the former insurer would have received income in the form of the semiannual insurance premiums payable on the deposit liabilities which were the subject of the assumption, and a failing SAIF participant could have had an opportunity to reach that income were the FDIC to have allowed it.  Here, the exit fee gave to the SAIF (and to its participants) 0.9 percent of the deposit liabilities assumed by Metrobank which translates into four to five times the annual assessment which the SAIF would otherwise have received as to those liabilities had they not been assumed by Metrobank.

We view the entrance fee as also paid as a nonrefundable premium for insurance coverage; in contrast with the exit fee, however, we understand the entrance fee to be paid for the

current year's insurance.  The use and purpose of the entrance

fee is diametrically different from that of the exit fee.  In

addition to the fact that the entrance fee is significantly less

than the exit fee, the entrance fee is paid to the fund that

insures the deposits of the institution that assumes the deposit

liabilities in a conversion transaction.  Moreover, the entrance

fee is imposed in accordance with an express congressional intent

to prevent dilution of the reserves of the current insurer

through the addition of unworthy participants which could prove

to be financially troubled and cause an undesired depletion of

that insurer's resources.  See H. Rept. 101-54(I), at 325 (1989).

But for the imposition of the entrance fee, the participants in

an FDIC fund could deplete the reserves of that fund if the fund

became liable for an extraordinary amount of deposit liabilities

which had been assumed by the participants in conversion

transactions.  After a BIF participant assumes the deposit

liabilities of a SAIF participant and pays an entrance fee,

however, the value of the BIF generally bears the same ratio to

the total deposits insured by the BIF (inclusive of the deposits

underlying the assumed deposit liabilities) as before the

conversion transaction.

We find additional support for our conclusion that Metrobank

derived insignificant benefits from its payment of the fees by

noting that Metrobank paid both fees incident to its management's

decision to assume the deposit liabilities of a failed savings association. Metrobank's management obviously made a business decision to pay the two fees to insure the assumed deposit liabilities with its regular insurer, the BIF; management decided not to forgo the fees, merge under the second exception to the moratorium, and insure the deposit liabilities with the SAIF. The BIF's annual insurance premiums were less expensive than those of the SAIF, and Metrobank, being a participant in the BIF, was obviously more familiar with its requirements. Although respondent observes correctly that Metrobank could have avoided the fees by assuming the deposit liabilities through a merger, Metrobank chose for business reasons not to do so. We decline to second-guess that business judgment. Under the facts herein, the exercise of such a sound and reasonable business practice under which a taxpayer such as Metrobank acts to minimize its recurring operating costs is not a significant future benefit that requires capitalization of the related nonasset-producing expenditures. Cost saving expenditures such as this, which are incurred in the process of fulfilling an everyday sound and reasonable business practice, as opposed to effecting a change in corporate structure, qualify for current deductibility under section 162(a). See T.J. Enters., Inc. v. Commissioner, 101 T.C. 581, 589 (1993) ("Expenditures designed to reduce costs are * * * generally deductible."), and the cases cited therein. This is

especially true where, as is here, the fees relate solely to the optional insurance of a liability and do not relate directly to either a capital asset or to an income producing activity. Cf. INDOPCO, Inc. v. Commissioner, 503 U.S. at 83-84 (capitalization generally required to match an expense with the income to be generated therefrom).

Respondent analogizes petitioner's payment of the fees with the purchase of a nontransferable membership interest, which, respondent asserts, is a capitalizable expense. According to respondent, Metrobank's membership interest in the BIF entitled it to: (1) A substantial reduction in future depository insurance premiums, (2) the right to insure all of its deposits in a more stable insurance fund, and (3) the need to adhere to only one regulatory scheme. We disagree with respondent's analogy.[9] First, as mentioned above, respondent makes no assertion that Metrobank's payment of either fee was related to the purchase of a capital asset.[10] Second, Metrobank was already

---

[9] We recognize that title 12 uses the terms BIF member and SAIF member to refer to the participants of those funds. See, e.g., 12 U.S.C. sec. 1813(d) (1994). We do not understand Congress' use of the word "member" to refer to a membership interest in the funds in the property sense of the word. In fact, respondent has not even made such an argument.

[10] In this regard, respondent relies incorrectly on Darlington-Hartsville Coca-Cola Bottling Co. v. United States, 273 F. Supp. 229 (D.S.C. 1967), affd. 393 F.2d 494 (4th Cir. 1968), and Rodeway Inns of Am. v. Commissioner, 63 T.C. 414 (1974), to support his position herein. The taxpayer in each of
(continued...)

participating in the BIF program before the transaction, and Metrobank could have continued its participation in the BIF program had it not consummated the transaction.  Third, new banks are not charged either fee to insure their deposit liabilities with the BIF, nor is either fee imposed when a bank assumes the deposit liabilities of another bank.  Fourth, the fees were nonrefundable, and any perceived benefit derived from Metrobank from its payment of the fees would have been extinguished completely had Metrobank terminated its FDIC insurance.

We conclude and hold that the fees are currently deductible. In so concluding, we note that respondent does not argue that the facts at hand are similar to the facts of <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345 (1971).[11]  Nor do we find that such is the case.  Whereas the payments in the <u>Lincoln Savings</u> case served to create or enhance for the taxpayer a separate and distinct asset, to wit, a "distinct and recognized property interest in the Secondary Reserve", <u>id.</u> at 354-355, the payments here did no such thing.

---

[10](...continued)
those cases purchased a capital asset incident to the payment of the expenses in dispute there.

[11] In fact, respondent does not even mention <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345 (1971), in his brief.

We have considered all arguments of the parties and, to the extent not discussed herein, find those arguments to be irrelevant or without merit.  To reflect concessions,

<u>Decision will be entered under Rule 155</u>.


Reviewed by the Court.

WELLS, CHABOT, COHEN, SWIFT, GERBER, COLVIN, FOLEY, VASQUEZ, and THORNTON, <u>JJ</u>., agree with this majority opinion.

SWIFT, J., concurring:  I write separately to clarify why I believe the fees paid by Metrobank to the FDIC are currently deductible.

In INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 86-87 (1992), the Supreme Court described two closely related types of costs that are to be capitalized under section 263:  (1) Costs incurred in connection with the acquisition, creation, or enhancement of a specific capital asset; and (2) costs that provide significant benefits that accrue to a taxpayer in future years.

Recently, in analyzing costs allegedly incurred in connection with the acquisition or creation of a capital asset, three Courts of Appeals have reversed all or part of recent Tax Court opinions.  See Wells Fargo & Co. & Subs. v. Commissioner, 224 F.3d 874 (8th Cir. 2000), affg. in part and revg. in part Norwest Corp. & Subs. v. Commissioner, 112 T.C. 89 (1999); PNC Bancorp, Inc. v. Commissioner, 212 F.3d 822 (3d Cir. 2000), revg. 110 T.C. 349 (1998); A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 119 F.3d 482 (7th Cir. 1997), revg. and remanding 105 T.C. 166 (1995).  In these opinions, because of the close relationship of the above types of costs, the Courts of Appeals use language and analyses that are relevant in the instant case to the issue as to the capitalization of fees paid because they allegedly provided to Metrobank significant future benefits.

In <u>Wells Fargo & Co. & Subs. v. Commissioner</u>, 224 F.3d at 885-887, the Court of Appeals for the Eighth Circuit explained as follows:

> it is not proper to decide that a cost must be capitalized solely because the fact finder determines that the cost is "incidentally connected" with a long term benefit.  This is supported by both Lincoln Savings and INDOPCO. * * *
>
> *       *       *       *       *       *       *
>
> The INDOPCO case addressed costs which were directly related to the acquisition, while * * * [Wells Fargo] involves costs which were only indirectly related to the acquisition. * * * In this case, there is only an indirect relation between the salaries (which originate from the employment relationship) and the acquisition (which provides the long term benefit * * *).

Based on the above analysis of the Court of Appeals for the Eighth Circuit, salary and investigatory costs indirectly relating to the acquisition of a capital asset and indirectly providing the taxpayer with future benefits were not required to be capitalized under INDOPCO because they did not directly provide significant future benefits to the taxpayer.  See <u>id.</u> at 889.

In <u>PNC Bancorp, Inc. v. Commissioner</u>, 212 F.3d at 829, involving expenses paid for credit reports, appraisals, and salaries relating to consumer loans, the Court of Appeals for the Third Circuit refused to conclude that --

in performing credit checks, appraisals, and other tasks intended to assess the profitability of a loan, the banks "stepped out of [their] normal method of doing business" so as to render the expenditures at issue capital in nature. Encyclopaedia Britannica, Inc. v. Commissioner, 685 F.2d 212, 217 (7th Cir. 1982).

The Court of Appeals for the Third Circuit, in PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 830, continued as follows (quoting from a portion of the taxpayer's brief):

the Tax Court proceeded from the clearly accurate premise that the expenses in question were associated with the loans, incurred in connection with the acquisition of the loans, or "directly related to the creation of the loans," * * * to the faulty conclusion that these expenses themselves created the loans. We conclude that the term "create" does not stretch this far. In Lincoln Savings, it was the payments themselves that formed the corpus of the Secondary Reserve; therefore, it naturally follows that these payments "created" the reserve fund. In * * * [the taxpayer's] case, however, the expenses are merely costs associated with the origination of the loans; the expenses themselves do not become part of the balance of the loan. * * *  [Citation omitted.]

While purporting to apply the Lincoln Savings language, both the Tax Court and the government effectively have transformed that language, by subtle but significant degrees, from a test based on whether a cost "creates" a separate and distinct asset, into a much more sweeping test * * * . * * *

In PNC Bancorp, Inc. v. Commissioner, 110 T.C. at 370, we concluded that the costs in issue were "assimilated" into the asset that was acquired. In contrast, the Court of Appeals for

the Third Circuit held that the costs reflected "recurring, routine day-to-day business" costs that may be currently deducted as the costs were not incurred for significant future benefits. PNC Bancorp, Inc. v. Commissioner, 212 F.3d at 834. While the benefits from the consumer loans would continue for years, the Court of Appeals for the Third Circuit resolved not to expand the type of costs that must be capitalized "so as to drastically limit what might be considered as 'ordinary and necessary' expenses." Id. at 830.

A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 119 F.3d 482 (7th Cir. 1997), involved fees paid to investment bankers to explore alternative transactions in connection with an unsuccessful defense of a hostile tender offer. In reversing the Tax Court's holding that the fees had to be capitalized, the Court of Appeals for the Seventh Circuit relied on the "well-worn notion" that costs incurred in defending a business are currently deductible. Id. at 487.

As noted in A.E. Staley Manufacturing by the Court of Appeals for the Seventh Circuit, the test to apply under INDOPCO is difficult to articulate and to apply. See id. The test is very factual and practical. In an effort to partially reconcile the various statements of the INDOPCO test and, in particular, in light of the recent Courts of Appeals' opinions reversing the Tax Court's application of the INDOPCO test, I offer the following:

Under <u>INDOPCO</u>, direct and indirect (e.g., overhead) costs that are similar to routine expenses incurred by a taxpayer in the ordinary and normal course of its business (e.g., salaries and insurance fees) need not be capitalized unless they directly relate to the acquisition, creation, or enhancement of a specific capital asset or unless they directly produce significant benefits to the taxpayer that accrue to the taxpayer in future years.

Applying this statement of the <u>INDOPCO</u> capitalization test to the fees involved in this case, it becomes clear that the fees should be currently deductible. Relevant aspects of the fees are described on pages 18-24 of the majority's opinion. I would emphasize that the fees --

(1) Were paid to the FDIC, the Federal governmental agency which routinely supervises Metrobank in the normal course of its business, not to Community, the transferor of the deposit liabilities and not to third-parties such as lawyers and financial advisers for a specific service necessary to consummate the conversion transaction;

(2) Were similar to other insurance fees that were routinely paid by Metrobank to the Federal government in the normal course of Metrobank's banking business;

(3) Both in amount paid per year ($71,518) and in the total cumulative amount paid over five years ($352,904), were generally less than Metrobank's total regular insurance premiums paid into the FDIC funds in a single year (in 1993 and 1994, $465,046 and $463,583 respectively, and in 1995, $322,245);

(4) Did not provide Metrobank with any additional insurance coverage with regard to its deposit liabilities (including those transferred from Community) and were not paid in lieu of the regular future annual insurance premiums due;

(5) Once paid by Metrobank into the insurance funds, were not refundable to Metrobank and were available for use by the FDIC to assist any participant in the funds;

(6) Were triggered by and were coincidental with the conversion transaction, but had the origin and purpose, and were assessed and paid not because thereof but because of the broader purpose to shore up the financial strength of the FDIC's insurance funds, the financial strength of which was of ongoing and necessary concern not just to the FDIC but to the entire financial community (and which concern reflected the same purpose for which Metrobank and others paid the annual premiums into the FDIC insurance funds).  In other words, the FDIC, Metrobank, Community, and all other contributors into the insurance funds had the same purpose for paying the annual premiums and for paying the exit and entrance fees (i.e., the maintenance of the financial integrity of the Federal government's depository liability insurance programs, essential not just to the government, but also to every participant in the financial community -- the government, the banks and savings and loans, and even you and I, the depositors who hope and trust that we will always be able to get our money back).


For the reasons stated, I respectfully concur.

CHIECHI, J., concurring:  Respondent chose to ask the Court to decide the issue of whether the exit fee and the entrance fee should be capitalized solely on the basis of respondent's theory that those fees generated certain significant future benefits for Metrobank.  The majority states that it will "decide this case as framed by respondent".  Majority op. p. 11.  However, the majority rejects respondent's reliance on Darlington-Hartsville Coca-Cola Bottling Co. v. United States, 273 F. Supp. 229 (D.S.C. 1967), affd. 393 F.2d 494 (4th Cir. 1968), and Rodeway Inns of America v. Commissioner, 63 T.C. 414 (1974),[1] because:  "The taxpayer in each of those cases purchased a capital asset incident to the payment of the expenses in dispute there."  Majority op. p. 24 note 10.  I am concerned that such language by the majority could be read to suggest its view on what the result in this case would have been if respondent had argued that the exit fee and the entrance fee should be capitalized because such fees constitute amounts expended to acquire an asset with a life extending substantially beyond the taxable year of acquisition.  See, e.g., Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974); Woodward v. Commissioner, 397 U.S. 572, 575-576 (1970); Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1379 (11th Cir. 1982), affg. in part and remanding in part T.C. Memo. 1981-

---

[1]On brief, respondent described those two cases as cases in which "the courts held that the taxpayers could not deduct expenses that were part of a plan to produce a positive business benefit for future years."

123; <u>American Stores Co. & Subs. v. Commissioner</u>, 114 T.C. 458, 468-470 (2000). If the majority intended to express no opinion on what the result in this case would have been if respondent had advanced such an argument, the majority should not have used language that, in my view, could be construed to suggest such an opinion.[2]

I have considered and resolved the issue of whether the exit fee and the entrance fee should be capitalized solely on the basis of respondent's theory that those fees produced certain significant long-term benefits for Metrobank. On the record presented, I, like the majority, reject respondent's theory that the benefits which respondent asserts the fees in question produced are significant long-term benefits requiring capitalization of those fees.[3] However, I disagree with the majority that the exit fee is a "final premium for insurance that it had already received", majority op. p. 20, and that the entrance fee is a "premium * * * paid for the current year's

---

[2]Similarly, if the majority decided this case "as framed by respondent", majority op. p. 11, the majority should not have concluded that, although respondent does not argue that the facts presented in this case are similar to the facts in <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345 (1971), see majority op. p. 25, the facts in the instant case are not similar to those facts, see <u>id.</u>

[3]Unlike the majority, I have not considered whether there are any benefits other than those alleged by respondent that are significant future benefits generated for Metrobank by the fees in question. See majority op. pp. 18-19.

insurance", majority op. pp. 21-22.  In my view, the record and 12 U.S.C. secs. 1815 and 1817 (1994) regarding the nature, use, and purpose of those nonrefundable fees, which were paid in five annual installments, belie the majority's analogy of the exit fee and the entrance fee to premiums paid for insurance coverage provided.

THORNTON, <u>J</u>., agrees with this concurring opinion.

RUWE, J., dissenting:  The majority refuses to consider whether the exit and entrance fees should be capitalized as costs incurred in connection with the acquisition of a capital asset because the majority believes that respondent failed to include this theory in his determination.  The majority reads the notice of deficiency too narrowly.  Respondent's determination, as contained in the notice of deficiency, states:

> It has been determined that your deductions for the entrance and exit fee paid to the Federal Deposit Insurance Corporation for the transfer of your insured deposits from one depository insurance to another depository insurance fund is a non-deductible capital expenditure that is not subject to depreciation or amortization.

The language contained in the notice of deficiency is broad and disallows deduction of the fees simply because respondent determined that the fees were capital expenditures.

The broad language contained in the notice of deficiency should not have misled petitioner into believing that it did not have to establish that the fees were not costs incurred in connection with the acquisition of a capital asset.  Petitioner's primary argument on brief was that the fees were for deposit insurance coverage for the years in issue.  Petitioner's alternative argument was that if the fees must be capitalized then they are to be associated with the acquired deposits and amortized over the useful life of the core deposits.  Thus, petitioner recognized that the fees might be viewed as being incurred in connection with the acquisition of capital assets.

There is nothing to indicate that there were any additional facts bearing on this case that could have been introduced. This case was submitted on the stipulated facts, and there is nothing to indicate that petitioner was not aware of its burden of proving entitlement to the claimed deductions, including the need to establish that the fees were not incurred in connection with the acquisition of assets.

This is not a case where respondent issued a narrowly drawn notice of deficiency and subsequently advanced new grounds not directly or implicitly within the ambit of the determination. See Pagel, Inc. v. Commissioner, 91 T.C. 200, 212 (1988), affd. 905 F.2d 1190 (8th Cir. 1990); Sorin v. Commissioner, 29 T.C. 959, 969 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959); Weaver v. Commissioner, 25 T.C. 1067, 1085 (1956). While the language contained in the notice of deficiency does not specifically state that the fees were costs incurred in connection with the acquisition of a capital asset, that is a reason for capitalization that is within the scope of the determination. The failure to enumerate every theory that could support a determination should not prevent us from deciding this case on what we consider to be the correct application of the law to the facts presented. See Rendina v. Commissioner, T.C. Memo. 1996-392; Barnette v. Commissioner, T.C. Memo. 1992-595, affd. without published opinion sub nom. Allied Management Corp. v.

Commissioner, 41 F.3d 667 (11th Cir. 1994). Indeed, this Court

has recognized on several occasions that we have the inherent

authority to decide a case on grounds not raised in the notice of

deficiency and will do so if petitioner is not surprised or

prejudiced by the ground. See Seligman v. Commissioner, 84 T.C.

191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Estate of

Horvath v. Commissioner, 59 T.C. 551, 555 (1973); Barr v.

Commissioner, T.C. Memo. 1989-69 n.24; Gmelin v. Commissioner,

T.C. Memo. 1988-338 n.18, affd. without published opinion 891

F.2d 280 (3d Cir. 1989).[1]

Petitioner bears "the burden of clearly showing the right to

the claimed deduction". INDOPCO, Inc. v. Commissioner, 503 U.S.

79, 84 (1992). In order for us to decide that petitioner is

entitled to a current business expense deduction under section

162(a), petitioner must establish that the fees: (1) Did not

create or enhance a separate or distinct asset;[2] (2) did not

---

[1]Where the record contains sufficient facts to permit us to
decide a case on an issue that would dispose of it, we shall do
so, regardless of whether the parties have pleaded the issue.
See Rendina v. Commissioner, T.C. Memo. 1996-392; Barnette v.
Commissioner, T.C. Memo. 1992-595, affd. without published
opinion sub nom. Allied Management Corp. v. Commissioner, 41 F.3d
667 (11th Cir. 1994); see also Park Place, Inc. v. Commissioner,
57 T.C. 767, 768-769 (1972).

[2]See Commissioner v. Lincoln Sav. & Loan Association, 403
U.S. 345, 354 (1971).

create significant future benefits;[3] and (3) were not incurred in connection with the acquisition of a capital asset.[4]

Capitalization is generally required for expenditures that are incurred by a taxpayer "in connection with" the acquisition of an asset. Such expenditures include more than just the stated purchase price of the asset. For example, wages paid in connection with the acquisition of a capital asset or legal fees paid to consummate an acquisition must be capitalized. See Commissioner v. Idaho Power Co., 418 U.S. 1 (1974); American Stores Co. & Subs. v. Commissioner, 114 T.C. 458 (2000).

In Commissioner v. Idaho Power Co., supra at 13, the Supreme Court observed:

> Of course, reasonable wages paid in the carrying on of a trade or business qualify as a deduction from gross income. * * * But when wages are paid in connection with the construction or acquisition of a capital asset, they must be capitalized and are then entitled to be amortized over the life of the capital asset so acquired. * * *

In American Stores Co. & Subs. v. Commissioner, supra at 469, we explained:

> A particular cost, no matter what its type, may be deductible in one context but may be required to be capitalized in another context. Simply because other cases have allowed a current deduction for similar

---

[3]See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 87-88 (1992).

[4]See Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974); American Stores Co. & Subs. v. Commissioner, 114 T.C. 458, 469 (2000).

expenses in different contexts does not require the
same result here. * * *

* * * * * * *

As previously indicated, expenditures which otherwise
might qualify as currently deductible must be
capitalized if they are incurred "in connection with"
the acquisition of a capital asset. Commissioner v.
Idaho Power Co., supra at 13. * * *

As further explained in Ellis Banking Corp. v. Commissioner, 688

F.2d 1376, 1379 (11th Cir. 1982):

The requirement that costs be capitalized extends
beyond the price payable to the seller to include any
costs incurred by the buyer in connection with the
purchase, such as appraisals of the property or the
costs of meeting any conditions of the sale. See,
e.g., Woodward v. Commissioner, 1970, 397 U.S. 572, 90
S.Ct. 1302, 25 L.Ed.2d 577; United States v. Hilton
Hotels Corp., 1970, 397 U.S. 580, 90 S.Ct. 1307, 25
L.Ed.2d 585. Further, the Code provides that the
requirement of capitalization takes precedence over the
allowance of deductions. §§ 161, 261; see generally
Commissioner v. Idaho Power Co., 1974, 418 U.S. 1, 94
S.Ct. 2757, 41 L.Ed.2d 535. Thus an expenditure that
would ordinarily be a deductible expense must
nonetheless be capitalized if it is incurred in
connection with the acquisition of a capital asset.[6]
The function of these rules is to achieve an accurate
measure of net income for the year by matching outlays
with the revenues attributable to them and recognizing
both during the same taxable year. When an outlay is
connected to the acquisition of an asset with an
extended life, it would understate current net income
to deduct the outlay immediately. * * *

[6]We do not use the term "capital asset" in the
restricted sense of section 1221. Instead, we use the
term in the accounting sense, to refer to any asset
with a useful life extending beyond one year.

Metrobank chose to acquire Community's assets. One way to

accomplish this was through a conversion transaction where assets

of an SAIF insured institution are transferred to a BIF insured

institution and, after the transfer, all deposits are insured by the BIF. Pursuant to this method, Metrobank was required to pay the exit and entrance fees. The other way Metrobank could have acquired Community's assets was to effectuate a merger with Community. If Metrobank had chosen to acquire Community through a merger it would have avoided the requirement to pay exit and entrance fees, but the deposits acquired from Community would have continued to be insured by the SAIF. Metrobank undoubtedly had its reasons for not entering into a merger transaction. On brief, petitioner states that among its reasons for choosing to acquire Community's assets in a conversion transaction in which it had to pay the exit and entrance fees were to reduce future deposit insurance premiums and reduce the future regulatory and reporting requirements that would otherwise have applied.[5]

The fact that the expenditures by Metrobank were incurred in connection with the acquisition of Community's assets is

---

[5]These objectives appear to be significant long-term benefits that support respondent's argument. Petitioner states on page 13 of its brief:

> Metrobank's purposes for incurring the expenditures were twofold. First, by electing to convert the deposits assumed from the SAIF to the BIF, Petitioner hoped to reduce future deposit insurance assessments because the BIF assessment rate was much less than the SAIF assessment rate. Second, Petitioner was already a member of BIF and understood the FDIC rules and regulations for insurance coverage through this system. Maintaining insurance coverage under both funds would significantly increase the reporting and administrative requirements on an ongoing basis.

especially clear in the case of the exit fee. On page 20, the majority asserts that the "purpose" of the exit fee was to protect the integrity of the SAIF for the potential benefit of SAIF participants. While this may have been the FDIC's purpose, it surely was not one of Metrobank's business purposes. Metrobank was never insured by the SAIF and derived no insurance coverage from the SAIF in return for payment of the exit fee. To the extent that "purpose" is relevant to the issue of capitalization versus deduction, it is the payor's (taxpayer's) purpose for making an expenditure that controls whether the expenditure must be capitalized. See INDOPCO, Inc. v. Commissioner, 503 U.S. at 85, 88-89. The majority, at pp. 20-21, erroneously relies on the payee's purpose for imposing the exit fee in order to justify the payor's (petitioner's) deduction.

The majority allows the exit fee as an insurance expense deduction. It justifies its conclusion that the exit fee did not produce significant future benefits for Metrobank by finding that all the insurance benefits from the SAIF had been received prior to Metrobank's acquisition of Community's assets.[6] The majority thus rejects petitioner's primary argument that the exit fee was paid for deposit insurance coverage that Metrobank received during the years in issue.[7] As described on page 20 of the

---

[6]Petitioner acquired Community's assets on Nov. 2, 1990.

[7]The years in issue are petitioner's fiscal years ending
(continued...)

majority opinion, the exit fee paid by Metrobank was for insurance coverage that Community's deposit liabilities had received <u>before</u> Metrobank acquired Community's assets and assumed its liabilities.[8]  Nevertheless, the majority concludes that "Metrobank paid the exit fee to the SAIF as a nonrefundable, final premium for insurance that <u>it</u> had already received." Majority op. p.20.  (Emphasis added.)  Of course, if the exit fee was paid for insurance that Metrobank had already received, it would follow that there was no significant future benefit. However, the majority's conclusion that the exit fee was a "premium" for insurance coverage that Metrobank had already received from the SAIF is clearly wrong.

Metrobank never received any "insurance" benefit from the SAIF.  Any SAIF insurance benefit was derived prior to Metrobank's acquisition of Community's assets.  Indeed, the majority acknowledges that "Metrobank was not affiliated with the SAIF either before or after the transaction" whereby it acquired Community's assets and liabilities.  Majority op. p. 21. Metrobank would have no reason to pay for "insurance" coverage on deposits for a period prior to its acquisition of those deposits.

---

[7](...continued)
Oct. 31, 1993, 1994, and 1995.

[8]It is ironic that the majority relies on this theory that petitioner never argued.  Petitioner argued that the exit fee paid to the SAIF was for insurance coverage that it received during the years in issue.  The majority correctly recognizes that Metrobank was not insured by the SAIF during those years.

It is obvious that Metrobank paid the exit fee because it was required in order for Metrobank to acquire Community's assets. The exit fee was paid for, and in connection with, the acquisition of Community's assets.

Petitioner has failed to prove its entitlement to the deductions in issue.  The uncontroverted facts show that the fees were costs incurred in connection with the acquisition of a capital asset.  Accordingly, the fees should be capitalized.

WHALEN, HALPERN, BEGHE, GALE, and MARVEL, <u>JJ</u>., agree with this dissenting opinion.

HALPERN, J., dissenting:

## I.  Introduction

We are faced here with a question of fact, whether petitioner's payments of the exit and entrance fees constitute capital expenditures.  Petitioner bears the burden of proving that they do not.  See Rule 142(a).  I do not believe that petitioner has carried that burden.  Therefore, I would sustain respondent's deficiency determinations to the extent allocable to respondent's disallowance of deductions for those payments.

## II.  Background

### A.  Facts

This case was submitted for decision without trial, the parties having stipulated or otherwise agreed to facts that each believed sufficient to make his (its) case.  See Rule 122(a).  The fact that this case was submitted upon a stipulated record does not alter petitioner's burden of proof.  See Rule 122(b).  Following is a summary of the significant facts relied on by petitioner.

Metrobank purchased certain assets of a failed savings association from the Resolution Trust Company (the purchase, the assets, Community, and the RTC, respectively).  It did so pursuant to a purchase and assumption agreement (the agreement), which states that, as consideration for the assets (and certain rights and options it acquired), Metrobank would pay to the RTC a premium of $400,000 and assume certain deposit and other

liabilities of Community's and undertake certain other obligations and duties.  At the time of the purchase, Metrobank was an "insured depository institution", within the meaning of section 204(c) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 191 (1989) (hereafter, without citation, FIRREA), 12 U.S.C. sec. 1813 (c)(2) (1988), and the purchase constituted a "conversion transaction" (conversion transaction) within the meaning of 12 U.S.C. sec. 1815(d)(2)(B) (Supp. I, 1989).  As a consequence, Metrobank required the approval of the Federal Deposit Insurance Corporation (the FDIC), which it obtained, to participate in the purchase.  12 U.S.C. sec. 1815(d)(2)(A) (Supp. I, 1989).  Because the purchase constituted a conversion transaction, Metrobank was obligated to pay the exit and entrance fees imposed by 12 U.S.C. section 1815(d)(2)(E) (Supp. I, 1989) (the exit fee and the entrance fee, respectively, or, collectively, the fees), which were assessed against it by the FDIC and became its liability. See 12 U.S.C. sec. 1815(d)(2)(F) (Supp. I, 1989); 12 C.F.R. sec. 312.10(a) (1991).  Metrobank paid the fees over 5 years, as permitted by 12 C.F.R. section 312.10(e) (1991), and deducted each payment (the payments) on its Federal income tax return for the year in which payment was made.

   B.   Issue Raised by the Pleadings

      On account of Metrobank's deductions of the payments (for 1993 through 1995), respondent determined deficiencies in tax.

In his notice of deficiency (the notice), respondent explained the adjustments giving rise to the deficiencies related to the payments as follows:

> It has been determined that your deductions for the entrance and exit fee paid to the Federal Deposit Insurance Corporation for the transfer of your insured deposits from one depository insurance [fund] to another depository insurance fund is a non-deductible capital expenditure that is not subject to depreciation or amortization. Accordingly, your taxable income is being increased as follows: [$71,518 for each year].

In the petition, petitioner assigned the following errors to respondent's adjustments:

> The Commissioner erred in disallowing petitioner's payment of $71,518 to the Federal Deposit Insurance Corporation as an ordinary and necessary business expense. The expenditure is allowable as an ordinary and necessary business expense pursuant to Section 162(a) and Treas. Reg. § 1.162-1(a).

By the answer, respondent denied petitioner's assignments of error. Respondent did not, however, disagree with petitioner's averments, which, in substance, reflect the facts stipulated. Petitioner filed no reply.

III. Discussion

A. Introduction

The details of the purchase are not in controversy. The pleadings establish that the only issue for decision is whether the payments entitle Metrobank to a deduction pursuant to section 162(a) and section 1.162-1(a), Income Tax Regs. Section 162(a) allows "as a deduction all the ordinary and necessary expenses

paid or incurred during the taxable year in carrying on any trade or business". As pertinent to this case, section 1.162-1(a), Income Tax Regs., states that, among items included in business expenses, are "insurance premiums against fire, storm, theft, accident, or other similar losses in the case of a business". Petitioner's burden is to prove that the payments are not capital expenditures as alleged by respondent in the notice.[1] I believe that petitioner has failed to carry that burden. Specifically, petitioner has not shown that, as to it, the exit fee is anything other that a cost incident to the purchase, nor has it shown that the entrance fee purchased an insurance benefit or, even if it did, that such insurance benefit did not extend beyond the year in which the purchase occurred.

B. The Exit Fee

1. Introduction

The exit fee is imposed by 12 U.S.C. section 1815(d)(2)(E)(i) (Supp. I, 1989), in an amount to be determined jointly by the FDIC and the Secretary of the Treasury (Secretary). See 12 U.S.C. sec. 1815(d)(2)(F) (Supp. I, 1989). The origin of the exit fee requirement is section 206(a)(7) of FIRREA. With respect to transactions such as the purchase,

---

[1] On the basis of the notice and the pleadings, it is apparently respondent's position that, if the payments are not capital expenditures, they may be deducted as ordinary and necessary business expenses under sec. 162(a).

regulations establish the amount of the exit fee as "the product derived by multiplying the dollar amount of the retained deposit base transferred from the Savings Association Insurance Fund member to the Bank Insurance Fund member by 0.90 percent (0.0090)".  12 C.F.R. sec. 312.5(c)(2) (1991).  In pertinent part, the term "retained deposit base" means:

> the total deposits transferred from a Savings
> Association Insurance Fund Member to a Bank Insurance
> Fund Member * * * less the following deposits:
>
> (1)  Any deposit acquired, directly or indirectly,
> by or through any deposit broker; and
>
> (2) Any portion of any deposit account exceeding
> $80,000.

12 C.F.R. sec. 312.1(j) (1991).

### 2.   Failure of Petitioner To Establish Purpose of the Exit Fee

There is no clear explanation in FIRREA of the purpose of the exit fee.  Moreover, the majority recognizes:  "The pertinent legislative history does not contain an explicit explanation of Congress' intent as to the imposition of the exit fee."  Majority op. p. 16.  Nevertheless, the majority speculates variously that the purpose of the exit fee is "to discourage SAIF-insured institutions from insuring their deposits with the BIF", Majority op. p. 15, "to protect the integrity of the SAIF, id. p. 20, and "to compensate the former insurer (in this case, the SAIF) for its future loss of income as to the assumed deposit liabilities", id. p. 21.  The majority also speculates that the purpose of the

exit fee is to compensate the Savings Association Insurance Fund from the cherry-picking of its desirable members:  "But for the conversion transaction, the former insurer would have received income in the form of the semiannual insurance premiums payable on the deposit liabilities which were the subject of the assumption, and a failing SAIF participant could have had an opportunity to reach that income were the FDIC to have allowed it."  Id.

The majority has failed to reconcile its various speculations with the condition imposed by 12 U.S.C. section 1815(d)(2)(C) (Supp. I, 1989), pertinent to the approval by the FDIC of a conversion transaction during the 5-year moratorium imposed by 12 U.S.C. sec. 1815(d)(2)(A)(ii)(Supp. I, 1989), that the FDIC may approve such a conversion transaction any time if:

> (ii) the conversion occurs in connection with the acquisition of a Savings Association Insurance Fund member in default or in danger of default, and the Corporation determines that the estimated financial benefits to the Savings Association Insurance Fund or the Resolution Trust Corporation equal or exceed the Corporation's estimate of loss of assessment income to such insurance fund over the remaining balance of the 5-year period referred to in subparagraph (A) * * *

Apparently, Congress intended the FDIC to approve conversion transactions involving a failed or failing Savings Association Insurance Fund (SAIF) member during the moratorium only if the loss of that member would improve the SAIF (e.g., if the present

value of any expected bailout of such member exceeded the present value of any expected premiums).[2]

Because petitioner failed to establish Congress' purpose in enacting the exit fee requirement, the majority's conclusions as to that purpose are not supported by the record. Perhaps petitioner could have obtained indirect evidence of Congress' purpose for the exit fee by establishing the rationale behind the FDIC's and the Secretary's decisions in implementing 12 U.S.C. section 1815(d)(2)(F)(i) (1988) (by promulgating 12 C.F.R. sec. 312.5) (1991).[3] Petitioner, however, did not do so. The record, therefore, contains no evidence from which we could conclude that the exit fee was collected and expended on petitioner's behalf for any benefit (for instance, insurance for the remainder of the

---

[2] The majority may have in mind the exit fee previously imposed by the Competitive Equality Banking Act of 1987 (CEBA), Pub. L. 100-86, 101 Stat. 552. See discussion in Majority op. p. 13. That exit fee, imposed by 12 U.S.C. sec. 1441(f)(4) (1988), was designed to protect against the Federal Savings and Loan Insurance Corporation's losing insured institutions. See H. Rept. 100-62, at 42 (1987) ("Some profitable well-capitalized institutions are considering converting from an institution insured by FSLIC to an institution insured by FDIC. * * * In order to reduce the amount of assessments flowing out of FSLIC during the recapitalization period, the Committee believes it is necessary to require the payment of a exit fee.")

[3] See, e.g., 55 Fed. Reg. 10406, 10408 (Mar. 21, 1990), prescribing interim rule for assessment of exit fee and setting exit fee at 0.90 percent of the deposit base as the "approximate present value of each SAIF member's pro rata share of interest expense on the obligations of the Financing Corporation ("FICO") projected over the next thirty years."

year in which the purchase occurred) that would entitle petitioner to a deduction under section 162(a).

3. <u>Petitioner Has Failed To Carry Its Burden of Proof</u>

Without any clear understanding of the purpose of the exit fee, I fail to see how petitioner has carried its burden of showing that the payments (as allocable to the exit fee) are not a capital expenditure. Petitioner argues: "The exit fee assessment is merely a one-time payment required by the FDIC to protect the SAIF when deposits are transferred out of the fund." Even if that claim were true, so what? How does it establish that the exit-fee-allocable payments were anything other than a cost incident to the purchase?

The purchase was an asset purchase, with Metrobank acquiring assets relating to the main office and one branch of Community. The assets were cash, cash items, securities, loans, various business assets, certain records and documents, and any assets securing liabilities assumed by Metrobank. The liabilities assumed by Metrobank pursuant to the agreement (the liabilities) consisted of indebtedness for deposits, secured indebtedness, and any indebtedness for unpaid employment taxes and ad valorem taxes.

With exceptions not here relevant, section 1012 provides the following rule: "The basis of property shall be the cost of such

property". Section 1.1012-1(a), Income Tax Regs., provides: "The cost is the amount paid for such property in cash or other property." As used in section 1012, the term "cost" (cost) has been interpreted to include any indebtedness to the seller for the purchase price of the property and any indebtedness to a third party secured by the property. See, e.g., Parker v. Delaney, 186 F.2d 455 (1st Cir. 1950) (purchase money indebtedness included in cost basis); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949) (cost basis of property acquired subject to liens for taxes and penalties includes amount of such liens); sec. 1.1012-1(g)(1), Income Tax Regs. (cost of property includes amount attributable to debt instrument issued in exchange for property). Cost also includes expenses of, or incident to, the acquisition of property. See, e.g, Warner Mountains Lumber Co. v. Commissioner, 9 T.C. 1171, 1174 (1947) (fee paid to attorney for examining title of property to be purchased is part of cost of property); sec. 1.263(a)-2(d), Income Tax Regs. (fees for architect's services); sec. 1.263(a)-2(e), Income Tax Regs. ("Commissions paid in purchasing securities"), approved in principle by Helvering v. Winmill, 305 U.S. 79 (1938).

It is clear that the cost of the assets includes not only the $400,000 premium paid by Metrobank to the RTC but also the liabilities. The conclusion suggested by the facts before us is

that the exit fee, which was imposed by statute and not by contract, was also part of that cost.  If the only measurable benefit to Metrobank resulting from payment of the exit fee is that such payment enabled Metrobank to proceed with the purchase, then I fail to see how the exit fee is anything other than a cost incident to the purchase of the assets.  There is nothing in the record (or in FIRREA) to support the majority's finding that: "Metrobank paid the exit fee to the SAIF as a non-refundable, final premium for insurance that it had already received." Majority op. p. 20 (emphasis added).[4]  Even if that were taken as a statement with respect to Community, it would not justify a current deduction for Metrobank any more than would Metrobank's payment of its indebtedness for Community's unpaid employment taxes and ad valorem taxes, which it assumed pursuant to the agreement.

4.  Conclusion

Petitioner bears the burden of proof, and the pleadings clearly establish what it is that petitioner must prove, viz, that the exit-fee-allocable payments were not a capital expenditure.  Clearly, respondent has failed to convince the majority that petitioner enjoyed the long-term benefits claimed for it by respondent.  That, however, in no way satisfies petitioner's burden.  Petitioner has failed to prove that the

---

[4]  To the contrary, see supra note 3.

exit fee constituted anything other than a cost incident to the purchase and, therefore, a capital expenditure. Petitioner has failed to prove its entitlement to a deduction on account of payment of the exit fee pursuant to section 162(a).

C. The Entrance Fee

1. Introduction

The entrance fee is imposed by 12 U.S.C. section 1815(d)(2)(E)(iii) (Supp. I, 1988) in an amount to be determined by the FDIC. The FDIC is guided in making that determination as follows:

> in the case of a conversion transaction in which the resulting or acquiring depository institution is a Bank Insurance Fund member, the fee shall be the approximate amount which the Corporation calculates as necessary to prevent dilution of the Bank Insurance Fund, and shall be paid to the Bank Insurance Fund;

12 U.S.C. sec. 1815(d)(2)(E)(iii)(I) (Supp. I, 1989). With respect to transactions such as the purchase, regulations establish the amount of the entrance fee as "the product derived by multiplying the dollar amount of the entrance fee deposit base transferred from the Savings Association Insurance Fund member to the Bank Insurance Fund member by the Bank Insurance Fund ratio."

12 C.F.R. sec. 312.4(c)(2) (1991). The term "entrance fee deposit base" is defined in 12 C.F.R. section 312.1(g) (1991) as follows:

> The term "entrance fee deposit base" generally refers to those deposits which the Federal Deposit Insurance Corporation, in its discretion, estimates to

have a high probability of remaining with the acquiring or resulting depository institution for a reasonable period of time following the acquisition, in excess of those deposits that would have remained in the insurance fund of the depository institution in default or in danger of default had such institution been resolved by means of an insured deposit transfer. The estimated dollar amount of the entrance fee deposit base shall be determined on a case-by-case basis by the Federal Deposit Insurance Corporation at the time offers to acquire an insured depository institution (or any part thereof) are solicited by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation.

The term "Bank Insurance Fund reserve ratio" is defined in 12 C.F.R. section 312.1(c) (1991) as follows:

The term "Bank Insurance Fund reserve ratio" shall mean the ratio of the net worth of the Bank Insurance Fund to the value of the aggregate total domestic deposits held in all Bank Insurance Fund members. * * *

Like the exit fee, the origin of the entrance fee requirement is in section 206(a)(7) of FIRREA. H. Rept. 101-54(I) (1989), is the report of the Committee on Banking, Finance and Urban Affairs that accompanied H.R. 1278, 101st Cong., 1st Sess. (1989), which, as enacted, became FIRREA. That report states that the entrance fee "must be enough to prevent the dilution of the reserves of the Fund to be joined by the institution." H. Rept. 101-54(I) at 325.

2. Petitioner's Claim, and Majority's Understanding, as to Purpose of Entrance Fee

On brief, petitioner argues: "Petitioner paid the entrance fee simply to insure the deposits transferred into the BIF until

the next FDIC premium assessment." The majority concurs: "[W]e understand the entrance fee to be paid for the current year's insurance." Majority op. pp. 21-22.

Neither petitioner nor the majority has convinced me that the entrance fee was a deductible insurance premium. Therefore, I do not believe that petitioner has carried its burden of showing that payment of the entrance fee meets the prerequisites for a deduction under section 162(a).

### 3. Discussion

Certain business-related insurance expenses unquestionably are deductible under section 162(a). See, e.g., sec. 1.162-1(a), Income Tax Regs., discussed supra in sec. III.A. Not all business-related, annual insurance premiums, however, are deductible under section 162(a). See, e.g., Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345 (1971) (disallowing deduction for "additional premiums" (prepayments of future premiums) paid by taxpayer to Federal Savings and Loan Association); Commissioner v. Boylston Mkt. Association, 131 F.2d 966 (1st Cir. 1942) (disallowing deduction for prepaid insurance premiums), affg. a Memorandum Opinion of this Court dated November 6, 1941. In Black Hills Corp. v. Commissioner, 101 T.C. 173 (1993), Supplemental Opinion at 102 T.C. 505 (1994), affd. 73 F.3d 799 (8th Cir. 1996), we disallowed deductions for those portions of annual premiums paid for black lung insurance that

the taxpayer had not shown to be commensurate with the actual risks of loss for the years of payment. We relied on INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992), to conclude that the premium payments, the deduction of which we disallowed, created significant future benefits for the taxpayer. See Black Hills Corp. v. Commissioner, 102 T.C. at 514.

It is a question of fact whether any premium payment creates future benefits that rule out a current deduction. The fact that Congress intended an entrance fee adequate to insure nondilution of the Bank Insurance Fund (sometimes, the Fund) is not, by itself, a sufficient fact to prove that its payment did not create a significant future benefit to Metrobank. The Fund was established by section 211 of FIRREA (adding, among other provisions, 12 U.S.C. sec. 1821(a)(5) (Supp. I, 1989)). The Fund was established by Congress for use by the FDIC to carry out its insurance purposes. See 12 U.S.C. sec. 1821(a)(4)(C) (Supp. I, 1989). Initial funding of the Fund came from the Permanent Insurance Fund. See 12 U.S.C. sec. 1821(a)(5)(B) (Supp. I, 1989). Additional funding was to come from annual assessments (the annual assessments) against insured depository institutions. See 12 U.S.C. sec. 1817(b)(1)(A) (Supp. I, 1989). Congress established a designated reserve ratio for the Fund of 1.25 percent of estimated insured deposits, or, if justified by circumstances that raise a significant risk of substantial future

losses, a higher percentage, up to 1.50 percent.  12 U.S.C. sec.
1817(b)(1)(B)(i) (Supp. I, 1989).  Assessment rates were fixed
for an initial period that might extend to 1995 (0.12 percent of
insured deposits for the year in question).  12 U.S.C. sec.
1817(b)(1)(C) (Supp. I, 1989).  However, with restrictions, the
FDIC could increase rates if necessary to restore the Fund's
ratio of reserves to insured deposits to its target level.  12
U.S.C. sec. 1817(b)(1)(C)(iv) (Supp. I, 1989).  Any assets of the
Fund in excess of 1.25 percent of insured deposits are treated as
a supplemental reserve, which assets, if the supplemental reserve
is no longer needed, are to be distributed to Fund members (but
earnings on those assets are to be distributed annually).  See 12
U.S.C. sec. 1817(b)(1)(B)(iii) (Supp. I, 1989).  Finally,
assessment income in excess of amounts necessary to maintain the
designated reserve ratio is to be credited against the Fund
member's assessment for the following year.  See 12 U.S.C. sec.
1817(d) (Supp. I, 1989).  Clearly, the annual assessment system
for the Fund designed by Congress contemplates continued
participation by insured depository institutions.  There are
multiperiod aspects to the system that raise questions as to the
extent of the deductibility of even the annual assessments.

The assessment system established by Congress is detailed
and complex.  The majority has made little reference to it.  The
entrance fee required of Metrobank was assessed at a rate

different from the annual assessment rate and on a base that did not necessarily take into account all of the deposit liabilities assumed by Metrobank pursuant to the purchase.  The purpose of the entrance fee was, as stated, to prevent dilution of the Fund. Whether the rationale for the actual entrance fee imposed by 12 C.F.R. section 312.4 (1991) is limited to that stated purpose is not clear.  Possibly, the fee imposed by 12 C.F.R. section 312.4 (1991) was designed to make up for what, in hindsight, was an inadequate annual assessment because, when that assessment was fixed, the conversion transaction was not taken into account.  On the other hand, perhaps it was a reserve contribution that would serve only to reduce next year's annual assessment.  Given the complex nature of the annual assessment system, without testimony from officials of the FDIC or other information, we do not know what the assessment of the entrance fee was designed to accomplish.

### 4.  Conclusion

Petitioner was required to prove a fact:  that the payment of the entrance fee created no significant future benefits that rule out a current deduction.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992).  Petitioner has failed to do so.  Petitioner has failed to prove its entitlement to a deduction on account of payment of the entrance fee pursuant to section 162(a).

IV.  Conclusion

Petitioner's task was established by the notice and the pleadings, to prove that the payments were not capital expenditures.  Respondent has not shifted the grounds on which he determined the related deficiencies.  Respondent has failed to persuade the majority of his view of the facts.  That, as stated, does not relieve petitioner of its burden to prove facts in support of its assigned error, that respondent erred in disallowing petitioner's deductions for the payments because they were capital in nature.  Petitioner has failed to carry its burden of proof.  Therefore, we should sustain the deficiencies related to the payments.

RUWE, WHALEN, BEGHE, GALE, and MARVEL, JJ., agree with this dissenting opinion.

BEGHE, J., dissenting:  The stipulated facts establish that Metrobank paid the exit and entrance fees to acquire selected assets and deposits of Community.  At least some of the acquired assets were capital, because Metrobank could expect to receive significant long-term benefits from them.  See Citizens & Southern Corp. v. Commissioner, 91 T.C. 463 (1988) (bank's acquisition of "core deposits" from another institution gave rise to amortizable intangible asset), affd. without published opinion 900 F.2d 266 (11th Cir. 1990).  Because the exit and entrance fees were paid to acquire capital assets, they must be capitalized.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); Commissioner v. Idaho Power Co., 418 U.S. 1, 13 (1974) (costs paid "in connection with" construction or acquisition of capital assets must be capitalized); Woodward v. Commissioner, 397 U.S. 572 (1970) (expenses incurred in connection with litigation originating in the acquisition or disposition of capital assets must be capitalized, regardless of payor's subjective motive); A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 119 F.3d 482, 488 (7th Cir. 1997) (describing Supreme Court's INDOPCO decision as "merely reaffirming settled law that costs incurred to facilitate a capital transaction are capital costs"), revg. 105 T.C. 166 (1995); sec. 1.263(a)-2(a), Income Tax Regs. (cost of acquisition of property having useful life substantially beyond the taxable year is a capital expenditure).

The majority advance three arguments for avoiding this seemingly inescapable conclusion. First, the majority claim that respondent "did not determine, and has declined to argue" that the fees should be capitalized on the ground that they were incurred in connection with the acquisition of capital assets. Majority op. p. 11. Second, the majority assert that the fees were paid to an insurer (the FDIC) in order to protect the "integrity" of the insurer's reserves. Majority op. pp. 19-22. Third, the majority claim that the fees were deductible "cost saving expenditures". Majority op. pp. 22-23. None of these arguments holds water.

Costs Incurred in Connection With Asset Acquisitions Are Capital

Even normally deductible costs must be capitalized if they are sufficiently related to the acquisition of a capital asset (or to some other capital transaction). As the Supreme Court stated in Commissioner v. Idaho Power Co., supra at 13:

> Of course, reasonable wages paid in the carrying on of a trade or business qualify as a deduction from gross income. * * * But when wages are paid in connection with the construction or acquisition of a capital asset, they must be capitalized and are then entitled to be amortized over the life of the capital asset so acquired.

This Court has recently cited Idaho Power Co. to support the holding that legal fees, like other expenditures that ordinarily might qualify as currently deductible, must be capitalized if

they are incurred "in connection with" the acquisition of a capital asset.  See American Stores Co. & Subs. v. Commissioner, 114 T.C. 458, 469 (2000).  But see Wells Fargo & Co. & Subs. v. Commissioner, 224 F.3d 874, 885-888 (8th Cir. 2000) (distinguishing expenditures directly related to capital transactions from expenditures indirectly related to such transactions), affg. in part and revg. in part Norwest Corp. & Subs. v. Commissioner, 112 T.C. 89 (1999).

### Respondent Sufficiently Raised Asset Acquisition Issue

According to the majority, respondent failed to argue that the exit and entrance fees were connected with Metrobank's asset acquisition; we should therefore defer consideration of this "theory" to another day.  Majority op. p. 11.  I disagree.

Although respondent didn't specifically argue that the fees were paid to acquire Community's assets and deposits, respondent did argue that the fees created significant long-term benefits for Metrobank.  The presence of significant long-term benefits is relevant to the case at hand because it serves to distinguish payments that result in the acquisition of capital assets from those that don't.  See sec. 263 (cost of "permanent improvements or betterments" must be capitalized); INDOPCO, Inc. v. Commissioner, supra at 87-88 (long-term benefit is an undeniably important and prominent, if not predominant, characteristic of a capital asset within the meaning of section 263, in part citing

Central Tex. Sav. & Loan Association v. United States, 731 F.2d 1181, 1183 (5th Cir. 1984)); Wells Fargo & Co. & Subs. v. Commissioner, supra at 883-884 (a separate and distinct capital asset always provides long-term benefits). Therefore, respondent's broader assertion of long-term benefits necessarily included the narrower assertion that the fees were part of Metrobank's cost of acquiring capital assets.[1]

More importantly, the stipulated record establishes that the fees were paid in connection with Metrobank's asset acquisition. We should therefore consider the factual, causal, and legal consequences of that relationship, even if respondent didn't expressly raise it as an issue, and even though the case at hand was submitted fully stipulated under Rule 122. In Ware v. Commissioner, 92 T.C. 1267 (1989), the taxpayer asserted that we should reconsider a case submitted under Rule 122 because the Commissioner allegedly had relied on a theory raised for the first time on brief. We denied the taxpayer's motion, and noted that under appropriate circumstances we can rest our decision for the Commissioner on reasons neither set forth in the notice of deficiency nor relied upon by the Commissioner. See Ware v. Commissioner, supra at 1269, and cases cited therein; Bair v.

---

[1] See majority op. p. 18, which states that "Expenses must generally be capitalized when they either: (1) Create or enhance a separate and distinct asset or (2) otherwise generate significant [long-term] benefits". (Emphasis added.)

Commissioner, 16 T.C. 90, 98 (1951) (Tax Court reviews a deficiency, not the Commissioner's reasons for determining it), affd. 199 F.2d 589 (2d Cir. 1952); Standard Oil Co. v. Commissioner, 43 B.T.A. 973, 998 (1941) (reasons and theories stated in statutory notice, even if erroneous, do not restrict the Commissioner in presenting case before the Court), affd. 129 F.2d 363 (7th Cir. 1942); cf. sec. 7522.

Our Consideration of Asset Acquisition Issue Would Not Prejudice Petitioner

Although respondent's actions don't limit our ability to consider the relationship between fees paid and assets acquired, the majority suggest we should close our eyes to that relationship "in order to avoid prejudicing petitioner". Majority op. p. 11. According to the majority, if respondent had stressed that relationship, "petitioner may well have wanted to offer evidence relating to it." Id.

I agree that the appropriate question is whether respondent's conduct has limited or precluded petitioner's opportunity to present pertinent evidence. See Ware v. Commissioner, supra at 1268-1269; Pagel, Inc. v. Commissioner, 91 T.C. 200, 211-213 (1988), affd. 905 F.2d 1190 (8th Cir. 1990). However, I disagree that there could be any prejudice in the case at hand. The stipulated facts clearly establish that Metrobank paid the fees in order to acquire the assets and deposits it

wanted to acquire. Indeed, payment of the fees was legally required, if Metrobank was to consummate the acquisition in the form it desired; Metrobank accordingly agreed in its bid to pay the fees to the FDIC. See majority op. p. 5. The record thus establishes that the fees were part of Metrobank's cost of acquisition; I can't imagine any evidence petitioner could have presented to support a contrary conclusion.[2] See Ware v. Commissioner, supra, and Pagel, Inc. v. Commissioner, supra.

The majority assert that considering the relationship between fees paid and assets acquired requires us to "second guess" petitioner's business judgment. See majority op. pp. 22-23. To the contrary, I accept that judgment; the payment of the fees was a necessary element of the transaction that petitioner, in its best business judgment, actually decided to achieve.[3]

---

[2] By contrast, in the cases relied upon by the majority, it was clearly possible that the taxpayers could have offered relevant evidence to support their position, or the Court believed that the record did not permit it to decide the issue. See Concord Consumers Housing Coop. v. Commissioner, 89 T.C. 105, 106-107 n.3 (1987) (Court did not consider whether taxpayer was sec. 216 cooperative housing corporation because neither party addressed the issue and Court could not tell from the record); Leahy v. Commissioner, 87 T.C. 56, 64-65 (1986) (Commissioner originally contended that partnership was not entitled to investment tax credit on ground that partnership was not owner of the property; later ground was alleged failure to attach statement to return, as required by regulations).

[3] It appears that the only way Metrobank could have acquired assets and deposits from Community, without paying exit and entrance fees, would have been to acquire control of Community

(continued...)

I also disagree with the majority's suggestion that our reliance on Metrobank's asset acquisition would unfairly surprise petitioner.  Petitioner was aware that respondent would rely on two cases referred to by the majority (see majority op. p. 24 note 10):  Darlington-Hartsville Coca-Cola Bottling Co. v. United States, 273 F. Supp. 229 (D.S.C. 1967), affd. 393 F.2d 494 (4th Cir. 1968), and Rodeway Inns of Am. v. Commissioner, 63 T.C. 414 (1974).[4]  The majority try to distinguish these cases on the ground that the taxpayer in each "purchased a capital asset incident to the payment of the expenses in dispute".  Majority op. p. 24 note 10.  Assuming the majority are correct, respondent's reliance on these cases put petitioner on notice of the importance of the connection between the payment of the fees and Metrobank's asset acquisition.

---

[3](...continued)
and then merge or consolidate with it.  See majority op. p. 16; Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, sec. 206(a)(7), 103 Stat. 183, 195, currently codified at 12 U.S.C. sec. 1815(d)(3)(A) (Supp. V, 1999)).  Of course, this is not what Metrobank did.  Moreover, such a transaction might have required Metrobank to acquire all assets (and assume all liabilities, including unknown and contingent liabilities) of Community, rather than a portion of them.

[4] See Brief for Petitioner at 22 (briefs were simultaneous), which states:  "The Respondent has cited Darlington-Hartsville Coca-Cola Bottling Co. v. United States, 393 F.2d 494 (4th Cir. 1968) and Roadway Inns of America v. Commissioner, 63 T.C. 414 (1974) as support for Respondent's argument that the exit and entrance fees were paid as part of a plan to produce a positive business benefit for future years."

There's other evidence of petitioner's awareness of the importance of that connection.  In its brief, petitioner argued in the alternative that, if the fees were capitalized, they should be amortized over the life of the "core deposits" acquired from Community.  See Brief for Petitioner at 24-25.[5]  Finally, respondent's long-term benefit argument sufficiently raised the issue whether the fees were part of the cost of acquiring capital assets, as I explained <u>supra</u> pp. 64-65.

Treating the Fees as Insurance Premiums Is Also Insufficient

Even if I accepted the majority's invitation to defer consideration of the asset acquisition "theory" to another day, I would still conclude that the fees must be capitalized.  The majority assert that deduction is proper because any long-term benefit to Metrobank "is insignificant when weighed against the primary purpose for the payment of the fees."  Majority op. p. 20.  According to the majority, that primary purpose was to

---

[5] There is no occasion in the case at hand to consider petitioner's alternative argument that, if the fees are capitalizable, petitioner is entitled to amortize them over a 10-year period; there is no evidence of useful life in the stipulated record.  It does seem to me that amortization should probably be allowed over such useful life of the core deposits acquired as could be shown.  See <u>Citizens & Southern Corp. v. Commissioner</u>, 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990); see also <u>First Chicago Corp. v. Commissioner</u>, T.C. Memo. 1994-300; <u>Trustmark Corp. v. Commissioner</u>, T.C. Memo. 1994-184, and compare Field Serv. Adv. Mem. 2000-08-005 (Feb. 25, 2000), where, in a transaction similar to the case at hand, the taxpayer amortized the entrance and exit fees over a 10-year period for financial statement purposes.

"protect the integrity" of the SAIF and the BIF.  Id.  The majority additionally assert that "Metrobank paid the exit fee to the SAIF as a nonrefundable, final premium for insurance that it had already received", while the entrance fee was a nonrefundable premium "for the current year's insurance."  Majority op. pp. 20-21.  Once again, I disagree.

The majority's conclusion that Metrobank paid the exit fee for insurance it had already received is clearly wrong.  As the majority opinion clearly states, the exit fee was paid to the SAIF.  See id.  The deposits of Community acquired by Metrobank were insured by the SAIF only when they were Community's deposits; those deposits became insured by the BIF upon their acquisition by Metrobank.

Therefore, if the exit fees accurately can be described as premiums for SAIF insurance, they were for insurance coverage the deposits received before Metrobank acquired them.  The only business purpose Metrobank could have had for paying this "SAIF insurance expense" was its desire to acquire Community's assets and deposits.

The majority's reliance on the role the fees played in protecting the "integrity" of the SAIF is misplaced.  While it may have been the FDIC's purpose in imposing the exit fees, it certainly wasn't Metrobank's reason for paying them.  Moreover, the FDIC's purpose is of limited relevance to the case at hand.

See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 354 (1971) ("It is not enough, in order that an expenditure qualify as an income tax deduction * * * that it serves to fortify FSLIC's [the predecessor of SAIF] insurance purpose and operation").

What all this means is that, even if the majority's characterization of the fees as insurance premiums is correct, the fees nevertheless must be capitalized. As I've already explained, ordinarily deductible expenditures must be capitalized, when they are incurred in connection with the acquisition of a capital asset. More generally, however, insurance premiums that give rise to benefits extending beyond the end of the taxable year must be capitalized, even if they are not connected with the acquisition of a capital asset. See Lincoln Sav. & Loan Association v. Commissioner, 51 T.C. 82, 94 (1968) (citing "long line of decisions by this Court holding that prepaid insurance premiums are capital expenditures to be expensed over the years in which coverage is actually obtained"), revd. 422 F.2d 90 (9th Cir. 1970), revd. 403 U.S. 345 (1971); sec. 1.461-4(g)(8) Example (6), Income Tax Regs. (where taxpayer pays premium in 1993 for insurance contract covering claims made through 1997, period for which premium is permitted to be taken into account is determined under the capitalization rules,

because the contract is an asset having a useful life extending substantially beyond the close of the taxable year).

The entrance and exit fees were in addition to the semiannual premiums Metrobank paid to the BIF to insure the acquired deposits after the acquisition. The fees were also several times greater than the semiannual premiums, as a percentage of the acquired deposits. See majority op. pp. 7-9, 21.[6] The exit and entrance fees therefore resemble premium prepayments, which entitled Metrobank to insure the acquired deposits with the BIF in future years. This would support capitalizing the exit and entrance fees, even if they had no connection with the acquisition of a separate asset. See Herman v. Commissioner, 84 T.C. 120 (1985) (one-time purchase of subordinated loan certificate, which entitled physician, upon payment of annual premiums, to malpractice insurance coverage, held capital investment; Commissioner conceded deductibility of annual premiums).

---

[6] The third of the emphasized points in Judge Swift's concurrence (Swift, J., concurring op. p. 31) compares the entrance and exit fees paid by Metrocorp to acquire the deposits of Community with the regular semiannual premiums paid by Metrocorp on its total deposits, including both its own deposits and the deposits of Community that it acquired. Obviously, the ratio of the entrance and exit fees to the regular semiannual premiums would be much higher if the regular premiums paid by Metrocorp on its own deposits are removed from consideration. They should be so removed if the much more meaningful comparison of the entrance and exit fees with the regular premiums on the acquired deposits is to be made.

The Cost Savings Argument Is Not Persuasive

The majority's final argument for deductibility is that cost savings expenditures, such as payments to escape from burdensome or onerous contracts, are generally deductible. See majority op. pp. 23-24. This principle may have been limited by the Supreme Court's opinion in INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 88-89 (1992) (identifying benefits of transformation from public to private company, such as avoidance of shareholder-relations expenses and administrative advantages of reducing the number of classes and shares of outstanding stock). Moreover, the majority's cost reduction analysis is defective; the case relied upon by the majority, T.J. Enters., Inc. v. Commissioner, 101 T.C. 581 (1993), is distinguishable. The payments in that case were made each year to reduce costs that otherwise would have been payable during each such year; the Court also noted that no separate and distinct additional asset was acquired by virtue of the payments sought to be deducted. See T.J. Enters., Inc. v. Commissioner, supra at 589 n.8, 592-593. By contrast, the fees in the case at hand entitled Metrobank to insure the acquired deposits with the BIF for many years to come (and, as noted above, the fees were connected with the acquisition itself).

Finally, we have held that a payment to terminate a burdensome contract may be capitalized, if the payment is also integrally related to the acquisition of a new long-term contract

with significant future benefits.  See <u>U.S. Bancorp & Consol. Subs. v. Commissioner</u>, 111 T.C. 231 (1998).  Even if one were to agree with the majority that the entrance and exit fees were paid in order to terminate burdensome insurance premium obligations, the entrance and exit fees would still fall within the rubric of long-term benefits.

For all the foregoing reasons, I respectfully dissent.

RUWE, WHALEN, and GALE, <u>JJ</u>., agree with this dissenting opinion.